# COMPANIA DE NAVIGACION LA FLECHA *v.* BRAUER.

## CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 89. Argued March 29, 30, 1897. — Decided October 28, 1897.

A contract, made at New York to carry cattle on deck of a steamboat from New York to Liverpool, contained these provisions: " On deck at owner's risk, steamer not to be held accountable for accident to, or mortality of, the animals, from whatever cause arising." " The carrier shall not be liable for loss or damage occasioned by causes beyond his control, by the perils of the sea, or other waters; " "by barratry of the master or crew; " "by collisions, stranding or other accidents of navigation, of whatsoever kind, even when occasioned by the negligence, default, or error in judgment of the pilot, master, mariners or other servants of the shipowner." *Held*, that by the terms of this contract, whether governed by the law of this country or by the law of England, the carrier was not exempted from responsibility for the loss of sound cattle, forcibly thrown or driven overboard, in rough weather, by order of the master, from unfounded apprehension on his part, in the absence of any pressing peril to the ship, and with no apparent or reasonable necessity for a jettison of the sound cattle, and no attempt to separate them from those which had already been injured by perils of the sea.

THIS was a libel in admiralty in the District Court of the United States for the Southern District of New York by William W. Brauer and Frederick C. Brauer, residing and doing business as partners under the name of William W. Brauer & Company at Richmond in the State of Virginia, and by the Reliance Marine Insurance Company, Limited, of Liverpool, a corporation organized under the laws of Great Britain, against the Compania de Navigacion la Flecha, a corporation organized under the laws of Spain, and owner of the steamship Hugo, to recover for the loss of cattle shipped by the partnership October 24, 1891, on deck of the Hugo at New York for Liverpool under a bill of lading, the material parts of which are copied in the margin, the parts there

printed in ordinary type being in print, and those in italics being in writing, in the original.[1]

The libel alleged that the vessel, having one hundred and

---

[1] Received in apparent good order and condition, by the *Spanish steamer Hugo,* from *Wm. W. Brauer & Co.,* to oe transported by the good steamship *Hugo,* now lying in the port of New York, and bound for *Liverpool, one hundred and sixty-five live cattle on deck. On deck at owner's risk, steamer not to be held accountable for accident to, or mortality of, the animals, from whatever cause arising;* being marked and numbered as per margin (weight, quality, contents and value unknown), and to be delivered in like good order and condition at the port of *Liverpool* (or so near thereto as she may safely get) unto *shippers' order* or to his or their assigns. *Freight prepaid in New York.* General average payable according to York-Antwerp rules.

It is mutually agreed that the ship shall have liberty to sail without pilots; to tow and assist vessels in distress; to deviate for the purpose of saving life or property; that the carrier shall have liberty to convey goods in lighters to and from the ship at the risk of the owners of the goods; and, in case the ship shall put into a port of refuge, or be prevented from any cause from proceeding in the ordinary course of her voyage, to tranship the goods to their destination by any other steamship.

It is also mutually agreed that the carrier shall not be liable for loss or damage occasioned by causes beyond his control, by the perils of the sea, or other waters; by fire from any cause and wheresoever occurring; by barratry of the master or crew; by enemies, pirates or robbers; by arrest and restraint of princes, rulers or people, riots, strikes or stoppage of labor; by explosion, bursting of boilers, breakage of shaft, or any latent defect in hull or machinery, or appurtenances; by collisions, stranding, or other accidents of navigation, of whatsoever kind, (even when occasioned by the negligence, default, or error in judgment of the pilot, master, mariners or other servants of the shipowner, not resulting, however, in any case, from want of due diligence by the owners of the ship, or any of them, or by the ship's husband or manager); nor by decay, heating, putrefaction, rust, sweat, change of character, drainage, leakage, breakage, or any loss or damage arising from the nature of the goods or the insufficiency of packages; nor for land damage; nor for the obliteration, errors, insufficiency or absence of marks, or numbers, address or description; nor for risk of craft, hulk or transhipment; nor for any loss or damage caused by the prolongation of the voyage.

\*    \*    \*    \*    \*    \*    \*

14. Also, that this contract shall be governed by British law, with reference to which law this contract is made.

And, finally, in accepting this bill of lading, the shipper, owner and consignee of the goods, and the holder of the bill of lading, agree to be bound by all of its stipulations, exceptions and conditions, whether written

sixty-five head of live cattle on board, sailed for the port of Liverpool on October 24, 1891; that "about October 31, 1891, the said vessel having encountered some rough weather, the master and crew of said vessel became panic stricken, and drove overboard one hundred and twenty-six head of cattle; the said vessel did not incur any extraordinary or unusual stress of weather, and the act of said master and crew in driving overboard said cattle was wholly unnecessary, and the loss of said cattle was due to the incompetency and lack of skill of the master and crew;" that the vessel afterwards arrived safely at Liverpool, and delivered to the shippers or their agents thirty-eight of the cattle in good condition, one having died; and that the insurance company, having insured the cattle, paid the partnership for the loss, and took an assignment of its rights of action against the steamer and her owners.

The answer alleged that the receipt, transportation and delivery of the cattle were subject to the terms and conditions of a contract between the shippers and the respondents, dated October 10, 1891, (which is copied in the margin,[1]) and of the

---

or printed, as fully as if they were all signed by such shipper, owner, consignee or holder.

[1] White Star Line. Cattle contract — Memorandum of agreement concluded at New York the tenth day of October, 1891, between H. Maitland Kersey, agent of the Spanish steamer Hugo, and Messrs. William H. Brauer & Co., of Richmond, Virginia.

The agent agrees to let to the said shipper suitable space, as undernoted, for the transportation of live cattle; this is to say:

On the steamer Hugo, intended to sail from New York about Oct. 24th, 1891, for Liverpool, England.

For about one hundred sixty live cattle on the upper deck.

No other cattle to be carried this voyage.

The shipper agrees to ship all the cattle, as above mentioned, at the rate of fifty shillings, British sterling, for each animal shipped on open decks.

The shipper especially agrees to prepay freight on the above mentioned shipments on date of sailing, in current funds at the rate for which prime bankers are selling sight bills on London, on the number of cattle shipped at New York, vessel lost or not lost, and irrespective of the number landed at the port of destination, and the shipper assumes all risk of mortality or accident, however caused, throughout the voyage.

bill of lading; admitted the sailing of the vessel with the cattle on board, and a loss of the cattle; denied the other allegations of the libel; and contained the following averments:

---

Stalls to be put up at ship's expense, and to be constructed to the satisfaction of the inspector or underwriters interested, and to the satisfaction of shipper, who will assume all responsibility for same, and for the various appliances for ventilation after shipment of cattle.

The steamer undertakes to supply sufficient good condensed or fresh water for the use of the animals during the voyage; also, water casks and hose.

Steamer to provide space, free of charge, for corn and strictly compressed fodder for animals, but freight, if demanded, shall be payable on any unusual excess of fodder landed at port of destination. If fodder be supplied that is not strictly compressed, a proportionate quantity may be carried on deck.

Steamer to supply suitable gangways and elevators for loading cattle.

Steamer to give free passage, over and back, and to supply bedding to drovers in charge of animals, (not exceeding one man to every thirty cattle,) and if not returning direct to port of sailing, to provide free intermediate passage back for foreman, and free steerage passage back for other attendants, by first available steamer of this line.

Steamer to give six running days' notice of her intended departure, and twelve hours' notice of the hour the cattle must be delivered to her, but such notices to be given or received are subject to become inoperative in case of strike or stoppage of labor

Steamer guarantees to sail as soon after shipment of all the animals as tide and weather permit, or pay expenses of keep of animals at the rate of 50c. per head per day in full.

Steamer has privilege of exceeding her net register tonnage in grain, upon payment to shippers the extra premium charged by the underwriters with whom the animals are insured.

Shippers to deliver the cattle to the vessel between sunrise and sunset, at the dock or in the stream, at their option.

Shippers guarantee to deliver animals by expiry of notice, provided vessel is ready for them, or to pay for detention of steamer at the rate of £50 per day.

In case of non-arrival of vessel in time to sail from New York on or before November 4, 1891, shipper has option of cancellation.

The line form of live stock bill of lading to be used for cattle shipped under this contract, and its conditions to govern any questions not provided herein, subject to U. S. Government inspection.

Any dispute arising under this contract to be settled by arbitration in the usual way.

Dated New York, October 10th, 1891.

H. MAITLAND KERSEY.
WM. W. BRAUER & CO.

"Further answering the said libel, the respondent avers that by the terms and conditions of the contract and bill of lading, under which the said cattle were received for transportation and delivery, it was provided that the carrier should not be liable for loss or damage occasioned by causes beyond his control, by the perils of the seas or other waters, or by other accidents of navigation, even when occasioned by the negligence, default, or error in judgment of the master, mariners or other servants of the shipowner, and that the cattle were carried on deck at the owner's risk, and under a special provision that the steamer should not be held accountable for accident to or mortality of the animals from whatsoever cause arising. There was a further provision that the contract should be construed and governed by the law as administered in the courts of Great Britain, with reference to which law the contract was stated to be and was made.

"And the respondent avers that the loss of said cattle was due to the perils of the sea encountered upon the said voyage, which broke certain of the cattle-houses and set the cattle adrift, and that during the continuance of the perils, and by reason thereof, certain of the cattle were washed overboard, and others were thrown about the deck, bruised and with broken limbs, and reduced to a dead, dying or hopeless condition, and that upon such being taken to the gangways, they were washed over by the seas."

"And the respondent avers that the care given to said cattle was according to the best judgment of the master of said steamer, and that, if he erred in his judgment or was in any degree negligent, which the respondent denies, still this respondent is absolved from accountability and responsibility by reason of the terms of the bill of lading; and also that, by the law as administered in the courts of Great Britain, the respondent, being itself without fault, is validly, under the terms of the said contract and bill of lading, absolved from all responsibility for any negligent or improper act or conduct on the part of the master, mariners or other servants of the respondent."

It was stipulated by counsel "that the English judicial

decisions, as contained in the printed decisions of the law or admiralty courts, may be referred to by either party as evidence of the English common or maritime law as administered in the English courts."

The conclusions of fact of the District Judge were summed up in his opinion as follows:

"During three days from October 30 to November 1, inclusive, the vessel met heavy weather, during which there was heavy rolling of the vessel. The cattle were in pens on deck; a few forward under and near the turtle-back, which were saved; the rest were in the vicinity of Nos. 3 and 4 hatches, forward and aft of the engine room, in pens built in the wings on the port and starboard sides of the ship, all of which were lost. The storm was heaviest on the afternoon and night of Saturday the 31st, the wind and seas coming first and heaviest from the northwest, but on Saturday hauling to the northward and to east northeast, with cross seas. Some slight damage was done to a few pens on the 30th; more were broken on Saturday the 31st, but these were repaired and the cattle put in place toward nightfall. About 5 o'clock on that day the after gangways were opened on each side, and about ten or twelve cattle that had become maimed and helpless were sent overboard through those gangways. The chief loss was during that night and the following morning, when, shortly after daylight, the captain gave orders to open the forward gangways also, and the whole deck was cleared of all the cattle save the thirty-nine under the turtle-back."

"Upon the whole testimony in this pitiful case, I am not disposed to pronounce any unfavorable judgment upon the handling of the ship by the master. His record as a master appears to have been good, and on any doubtful question of navigation he is entitled to the benefit of his record. He had some, though not large, experience in the transportation of cattle; and the experts called by each party place so much stress upon the special circumstances of the situation, the quality of the ship, and the necessary determination of the master's own judgment at the time, that in the circumstances

testified to I do not find any conclusive proof adverse to the master's judgment as to the navigation of the ship.

"The evidence leaves not the least doubt in my mind, however, that the sacrifice of a considerable number of live cattle that were not maimed or substantially hurt was made on the morning of Sunday, the 1st of November, not from any pressing necessity, but solely from mere apprehension; and I am further persuaded that there was no reasonable or apparent necessity for the sacrifice. It was morning. The night was past. No one testifies to any pressing peril to the ship. The log does not hint of it. No reason appears why such cattle as could go about, and were actually going about, should not have been cared for and preserved. There was plainly no effort made to separate the sound from the maimed. Even the master says, in answer to the question, 'Were these cattle standing up that went overboard? Ans. They were down. Some may have been up; I don't know.' His object plainly was to clear the deck of all the cattle from No. 3 aft, with no attempt to discriminate or save any. His state of mind is shown by his concluding words: 'We all breathed happily when we saw it open' (No. 3 hatch)."

The District Judge was of opinion that the stipulations of the bill of lading, so far as they undertook to exempt the respondent from accountability for the negligence of the master or crew, though valid by the law of England, were invalid by our law; and therefore decreed "that the libellants recover damages for such of the oxen as were of any market value and not fatally wounded or maimed at the time when the houses and cleats provided for them were designedly torn up, and which oxen were cast overboard or negligently suffered to go overboard through the open gangways on the morning of November 1st, and on the evening of the night previous;" and referred the case to a commissioner to ascertain and report the amount of such damage. 57 Fed. Rep. 403.

The commissioner reported that sixty-three of the cattle were thus voluntarily and unnecessarily sacrificed, and assessed damages for that number of cattle. The District Court confirmed his report, and entered a decree accordingly for the libellants. 61 Fed. Rep. 860.

Both parties appealed to the Circuit Court of Appeals, which adopted the conclusions of fact of the District Court, and affirmed the decree upon the ground that the case was not within the exceptions in the bill of lading. 35 U. S. App. 44.

The respondent applied for and obtained a writ of certiorari from this court.

*Mr. Wilhelmus Mynderse* for Compania de Navigacion la Flecha.

The action is prosecuted in the courts of the United States in attempted evasion of the agreement "that the contract shall be governed by British law."

The libellants, attracted apparently by the decision in the case of the *Brantford City,* 29 Fed. Rep. 373, have sought to build a similar case against the respondent, and have come far out of their way to bring suit in the same jurisdiction. Liverpool was the port of destination. It was there that the Insurance Company, the principal libellant herein, and the only libellant that profits by the decree, had its principal offices, and it was there that the claim should have been presented and pressed, if presented and pressed at all. Apparently no claim was presented there. But six months later the Insurance Company came to New York and instituted this suit.

The libellants did not make proper provision for the cattle.

The storm encountered by the Hugo was one of notable severity, and the losses of the cattle were due to the perils incident to the storm. The steamer itself was intelligently and prudently managed and navigated during the time of it, and the courts below were in error as to the facts.

The bill of lading provides that "this contract shall be governed by the British law," with reference to which law the contract was made.

In *Liverpool Steamship Co.* v. *Phenix Ins. Co.,* 129 U. S. 397, this court said (page 458): "The review of the principal cases demonstrates that according to the great preponderance,

if not the uniform concurrence, of authority, the general rule that the nature, the obligation and the interpretation of a contract are to be governed by the law of the place where it is made, unless the parties at the time of making it have some other law in view, requires a contract of affreightment made in one country between citizens or residents thereof, and the performance of which begins there, to be governed by the law of that country, unless the parties, when entering into the contract, clearly manifest a mutual intention that it shall be governed by the law of some other country."

The court held in that case that there was nothing to indicate that the contracting parties looked to any other law than the law of the United States.

In the case under consideration, however, it is apparent that the parties did look to the law of England; that they deliberately chose it; that it was not an exaction from a shipper by a carrier, but that it was in accord with a preliminary contract, freely made and unobjected to. The cattle were destined to an English port. It was fitting that reference should be made to the law of that port. Any differences between shippers and shipowners would naturally be submitted to the law of the place where their relations terminated. Moreover, the Reliance Marine Insurance Company, which represents the entire interest of the libellants, is a British corporation having its principal office in Liverpool, the port of the Hugo's destination.

The validity of the provisions of the bill of lading should be determined by the standard of what is just and reasonable in the eye of the law. *Railroad Co.* v. *Lockwood*, 17 Wall. 357, 380, 382. It is just and reasonable to apply the British law, the law of the port of destination.

The District Judge declined to enforce the English law, upon the ground that the stipulation in the bill of lading providing for the application of the British law was invalid as against the public policy of the United States. A similar provision has, however, been sustained in the District Court of Maryland. *The Oranmore*, 24 Fed. Rep. 922, 927. The United States Circuit Court of Appeals avoided any discus-

sion of the application of the British law, disregarding certain of the exemption clauses, and holding in respect to others that the facts did not render the question of applying the British law material.

The provision in the bill of lading that the contract be governed by British law is not invalid.

It cannot be fairly said that there is a question in the case whether or not it is against the public policy of this country to permit a carrier by sea to exempt himself from the consequences of his servants' negligence or error. The real question is whether it is against the public policy of this country to permit shipowner and shipper to agree in New York that their contract for a shipment of cattle from New York to England shall be construed according to the place where the final performance of the contract takes place and where, if anywhere, differences as to the performance by the carrier of his engagements would naturally arise.

It is especially proper that where a contract relates to transportation on the high seas from one nation to another, the entire transaction not being under the jurisdiction of any one nation, the parties shall declare in their contract the jurisdiction by the laws of which they intend their contract to be governed.

With such declaration made, it is against public policy and against commercial integrity to permit either party, and especially the party with whom the right to select the forum rests, to insist that the law of the forum, and not the law stipulated in the contract, should be applied to the construction of the contract.

It has been said by this court that it is against public policy to permit a carrier to exempt himself from the consequences of the negligence of his servants. *Railroad Co.* v. *Lockwood*, 17 Wall. 357, 378. The rule has been extended from the strict obligations resting upon a carrier by land, to cover those of a carrier by sea. *Liverpool Steam Co.* v. *Phenix Ins. Co.*, 129 U. S. 397.

At the time this latter decision was made there was no legislative distinction between the obligations and rights of a

carrier by sea and of a carrier by land. Nor, indeed, was there any such distinction at the time these cattle were shipped upon the Hugo. But Congress, with whom certainly rests the right to declare the public policy of a country, have since that date passed an act, known as the Harter Act, which provides in terms that: "If the owner of any vessel transporting merchandise or property to or from any port in the United States of America, shall exercise due diligence to make the said vessel in all respects seaworthy and properly manned, equipped and supplied, neither the vessel, her owner or owners, agent or charterers, shall become or be held responsible for damage or loss resulting from faults or errors of navigation, or in the management of said vessel, nor shall the vessel, her owner or owners, charterers, agent or master be held liable for losses arising from dangers of the sea or other navigable waters," etc. Act of February 13, 1893, c. 105, 27 Stat. 445.

If this loss had occurred subsequent to July 1, 1893, there would have been no recovery for the libellants under the laws of the United States.

Prior to July 1, 1893, there could be no recovery for the libellants according to the laws of Great Britain, and to those laws they should be remitted.

But if this court will not reëxamine the facts, and accepts the facts as found by a majority of the Judges of the Circuit Court of Appeals, still no liability rests upon the ship-owner for the loss of libellants' cattle under the contract of shipment, such contract being governed by the law of Great Britain.

It was recited in the bill of lading that the cattle were shipped "on deck at owner's risk." That such a provision should be made respecting a shipment of live animals to be transported on the deck of a freight steamer across the Atlantic, at a tempestuous season of the year, was eminently proper, and due allowance for the risks assumed by the owner of the cattle was undoubtedly made in the rate of freight at which the cattle were accepted for carriage.

In the case of *Burton* v. *English*, 12 Q. B. D. 218, a similar

clause, "The steamer shall be provided with a deck cargo, if required at full freight, but at merchant's risk," was considered by the Judges of the Court of Appeal, who substantially held that it relieved the shipowner from all responsibility for the acts of his servants, except responsibility to contribute in general average in case of lawful jettison or other lawful sacrifice.

Brett, M. R., said: "It is obvious that this is a stipulation in favor of the shipowners, for, in order to earn a larger freight, they may require part of the cargo to be deck cargo, and then it is to be at the merchant's risk. My brother Cave, who delivered the judgment of the Divisional Court, held that this stipulation absolved the shipowners from liability to contribute to general average. It must be admitted that if there were an *improper jettison* by the master and crew, this stipulation would relieve the shipowners from liability. . . . If the liability is in consequence of any act of any of his servants for which the shipowner would be liable but for this stipulation, then it follows that the defendants are freed from liability. I should say that this stipulation would cover any act of the master or crew, which being done by them as servants of the shipowner would otherwise make him liable; it therefore covers the case of improper jettison, also a loss caused by a collision or stranding owing to the negligence of the master or crew."

Bowen, L. J., said, respecting the clause: "Now, that clearly is a stipulation in favor of the shipowners, and *prima facie* it seems to me meant to relieve them from the responsibility of some act of their servants by which they would otherwise be bound, and from the incidents of some risk which otherwise would fall upon them as carriers and under their contract of carriage. It would, I think, clearly cover improper jettison, also it would cover negligence of the captain or crew, occasioning stranding or collision, and any other acts, if any there be, of the servants of the shipowners for which they would otherwise be responsible."

Baggallay, L. J., concurred in the view of Justices Brett and Bowen. See, also, *Lewis* v. *Great Western Railway*, L. R.

3 Q. B. D. 195; *McCauley* v. *Furness Railway*, L. R. 8 Q. B. 57.

If the immediate cause of loss is to be deemed an accident of navigation, the shipowner is freed from liability, even though such accident was remotely due to the negligence, default or error in judgment of the pilot, master or mariners of the ship. Carver's Carriage by Sea, 2d ed. § 101, p. 110; *The Duero*, L. R. 2 Ad. & Ec. 393 (1869); *Grill* v. *General Iron Screw Colliery Co.*, L. R. 1. C. P. 600 (1866); *The Cressington*, (1891,) Prob. 152.

Finally, it is a matter of peculiar interest that this court should declare the effect of a clause which provides that the bill of lading should be governed by a law other than the law of the place of issue.

The question has arisen in numerous cases, but there is as yet no authoritative decision in any appellate tribunal.

The clause has been sustained as valid in the District Court of the United States for the District of Maryland. *The Oranmore*, 24 Fed. Rep. 922. It has been rejected as invalid in the District Court of the United States for the Southern District of New York, and in the District Court of the United States for the District of Massachusetts. *The Brantford City*, 29 Fed. Rep. 373, 396; *The Guildhall*, 58 Fed. Rep. 796; *The Iowa*, 50 Fed. Rep. 561.

No appellate tribunal has passed upon the validity of the clause, and no certainty can be felt by the enormous commercial and shipping interests using bills of lading until the question has been adjudicated in this court.

There is not involved any question as to abandoning the declarations of public policy already made by this court respecting the exemption of a carrier from the consequences of his servants' negligence.

There is not involved even the question of a modification of such declarations, because of the provisions of the Harter Act.

There is not involved any question of introducing the law of a foreign country for the construction of the terms of contracts made and performed here.

The question is, whether a shipper and a shipowner may in

contracting here for the transportation of cargo from this country to a foreign country, validly stipulate that any disputes or differences under the contract shall be determined by the law of the country where the shipment is to be delivered.

We submit that it is "reasonable and just in the eye of the law" for the parties to agree to submit their rights to the law of the place where their relations will naturally terminate. If the court holds that such a stipulation is "reasonable and just in the eye of the law," then the contract must be sustained, even though such foreign law does differ from the law of the United States. *Railroad Co.* v. *Lockwood,* 17 Wall. 357, 380, 384.

*Mr. W. W. MacFarland* for Brauer and others.

MR. JUSTICE GRAY, after stating the case, delivered the opinion of the court.

The contract sued on was made in October, 1891, more than a year before the passage of the Harter Act, and the case is unaffected by its provisions. Act of February 13, 1893, c. 105; 27 Stat. 445.

By the law of this country, before that act, as declared upon much consideration by this court, common carriers, by land or sea, could not, by any form of contract with the owner of property carried, exempt themselves from responsibility for loss or damage arising from negligence of their own servants; and any stipulation for such exemption was contrary to public policy and void. *Railroad Co.* v. *Lockwood,* 17 Wall. 357; *Liverpool Steam Co.* v. *Phenix Ins. Co.,* 129 U. S. 397.

By the modern decisions in England, on the other hand, made since it has become to us a foreign country, common carriers, except so far as controlled by the provisions of the Railway and Canal Traffic Act of 1854, were permitted to exempt themselves by express contract for responsibility for losses occasioned by negligence of their servants. *Peck* v. *North Staffordshire Railway,* 10 H. L. Cas. 473, 493, 494;

*Steel* v. *State Line Steamship Co.*, 3 App. Cas. 72 ; *Manchester &c. Railway* v. *Brown*, 8 App. Cas. 703 ; *In re Missouri Steamship Co.*, 42 Ch. D. 321 ; *The Cressington*, (1891) Prob. 152.

In the case at bar, the decision of the District Judge proceeded upon the ground that any stipulation directly exempting the carrier from all liability for negligence of his servants being void by our law as against public policy, the equivalent stipulation that the contract should be governed by the law of England was equally void, and could not be enforced in the courts of the United States. That decision is in accordance with the previous decision of the same judge in *The Brantford City*, 29 Fed. Rep. 373, and with several subsequent decisions of his. *The Energia*, 56 Fed. Rep. 124 ; *The Guildhall*, 58 Fed. Rep. 796 ; *Botany Mills* v. *Knott*, 76 Fed. Rep. 582. The like view has been taken by Judge Nelson in the District of Massachusetts in *The Iowa*, 50 Fed. Rep. 561 ; by Judge Benedict in the Eastern District of New York in *Lewisohn* v. *National Steamship Co.*, 56 Fed. Rep. 602 ; and by Judge Butler in the Eastern District of Pennsylvania in *The Glenmavis*, 69 Fed. Rep. 472. See also *Oscanyan* v. *Arms Co.*, 103 U. S. 261 ; *Hamlyn* v. *Talisker Distillery*, (1894) App. Cas. 202, 209, 214 ; *Rousillon* v. *Rousillon*, 14 Ch. Div. 351, 369.

But it is unnecessary to express a decisive opinion upon the validity of the contract, because, assuming it to be valid and to govern the case, this court concurs with the Circuit Court of Appeals in the opinion that the respondent was liable for the loss in question.

Exceptions in a bill of lading or charter party, inserted by the shipowner for his own benefit, are unquestionably to be construed most strongly against him. *The Caledonia*, 157 U. S. 124, 137 ; *The Majestic*, 166 U. S. 375, 386 ; *Norman* v. *Binnington*, 25 Q. B. D. 475, 477 ; *Baerselman* v. *Bailey*, (1895) 2 Q. B. 301, 305.

By the laws of both countries, the ordinary contract of a common carrier by sea involves an obligation on his part to use due care and skill in navigating the vessel and in carrying the goods; and an exception, in the bill of lading, of perils

of the sea, or other specified perils, does not excuse him from that obligation, nor exempt him from liability for loss or damage from one of those perils, to which the negligence of himself or his servants has contributed.

This rule of construction was fully established in this court before it had occasion to decide the question whether it was within the power of the carrier by express stipulation to exempt himself from all responsibility for the negligence of himself or his servants.

In the leading case of *New Jersey Steam Navigation Co.* v. *Merchants' Bank*, 6 How. 344, a crate of William F. Harnden, in which was money belonging to the bank, was shipped upon a steamboat of the navigation company under an agreement stipulating that " the said crate, with its contents, is to be at all times exclusively at the risk of the said William F. Harnden, and the New Jersey Steam Navigation Company will not, in any event, be responsible, either to him or his employers, for the loss of any goods, wares, merchandise, money, notes, bills, evidences of debt, or property of any and every description, to be conveyed or transported by him in said crate, or otherwise, in any manner in the boats of the said company." This court held that the navigation company was not thereby exonerated from loss by fire arising from the negligence of that company or its servants; and the reasons for the decision were stated by Mr. Justice Nelson as follows: " The special agreement, in this case, under which the goods were shipped, provided that they should be conveyed at the risk of Harnden; and that the respondents were not to be accountable to him or to his employers, in any event, for loss or damage. The language is general and broad, and might very well comprehend every description of risks incident to the shipment. But we think it would be going farther than the intent of the parties, upon any fair and reasonable construction of the agreement, were we to regard it as stipulating for wilful misconduct, gross negligence, or want of ordinary care, either in the seaworthiness of the vessel, her proper equipments and furniture, or in her management by the master and hands." " If it is competent at all for the carrier to

stipulate for the gross negligence of himself, and his servants or agents, in the transportation of the goods, it should be required to be done, at least, in terms that would leave no doubt as to the meaning of the parties." 6 How. 383, 384. See also *The Hornet*, 17 How. 100; *Transportation Co.* v. *Downer*, 11 Wall. 129; *The Syracuse*, 12 Wall. 167; *Liverpool Steam Co.* v. *Phenix Ins. Co.*, 129 U. S. 397, 438.

In England, likewise, it has long been recognized as a settled rule that under a contract to carry goods, containing an exception such as of "breakage or leakage," or of "barratry of the master or mariners," or of "perils of the sea," there still rests upon the carrier, not merely the duty to carry the goods if not prevented by the excepted perils, but also the obligation that he and his servants shall use due care and skill and shall not be negligent in carrying the goods. *Phillips* v. *Clark*, 2 C. B. (N. S.) 156; *The Helene*, L. R. 1 P. C. 231; *Lloyd* v. *The General Iron Screw Colliery Co.*, 3 H. & C. 284; *Grill* v. *Same*, L. R. 1 C. P. 600, and L. R. 3 C. P. 476; *Czech* v. *General Steam Navigation Co.*, L. R. 3 C. P. 14; *Steel* v. *State Line Steamship Co.*, 3 App. Cas. 72, 87, 88; *Manchester &c. Railway* v. *Brown*, 8 App. Cas. 703, 709, 710; *The Xantho*, 12 App. Cas. 503, 510, 515.

The English case most resembling in its circumstances the case at bar is *Leuw* v. *Dudgeon*, briefly reported in L. R. 3 C. P. 17 note, and more fully in 17 Law Times, (N. S.) 145, by which it appears to have been as follows: Cattle were shipped, some of them on deck, under a bill of lading containing these clauses: "Ship free in case of mortality, and from all damage arising from the act of God, the Queen's enemies, fire, accidents from machinery, or boilers, steam, or other dangers of the seas, rivers, roadsteads or steam navigation whatsoever." "The ship not liable for accident, injury, mortality, or jettison, whether shipped on deck or in the hold." On the vessel putting out to sea, she experienced fine weather and the sea was smooth, but there was a ground swell, and after she had been out some time she suddenly rolled over on her beam ends; the cattle pens gave way, and the cattle fell over to the starboard side, and in order to save the vessel it was

necessary to throw those on deck overboard. It was held that if the accident was owing to the vessel putting to sea with insufficient ballast, the owners were liable, notwithstanding the exemptions in the bill of lading, which included "jettison" as well as "accidents from dangers of the seas."

In that case, indeed, (as in the case in this court of *The Caledonia*, above cited,) the fault of the shipowner consisted in sending the ship to sea in an unseaworthy condition. But Mr. Justice Willes, who delivered the leading opinion, laid down the general rule that "the exceptions were intended to save the shipowner from liability for the effects of accident, and not to absolve him from the duty of exercising reasonable diligence." 17 Law Times, (N. S. ) 146. And he treated the case as coming within the principle of that rule as affirmed in the cases, above cited, of *Phillips* v. *Clark* and *Grill* v. *General Iron Screw Colliery Co.*, in the one of which the clause "not to be accountable for leakage or breakage," and in the other the clause "accidents or dangers of the seas, rivers or navigation, of whatever nature or kind soever, excepted," was held not to cover a loss, otherwise within the exception, caused by the negligence of the master or crew. So in *Steel* v. *State Line Steamship Co.*, above cited, Lord Blackburn said, in the House of Lords, that in construing such exceptions in a bill of lading exactly the same considerations would arise as to the duty of the shipowner to furnish a ship really fit for the purpose, as had been applied, in the series of cases of which *Phillips* v. *Clark* was the leading one, to the duty of himself and his servants to use due care and skill in carrying the goods.

In *Notara* v. *Henderson*, L. R. 7 Q. B. 225, 236, the Court of Exchequer Chamber, in a considered judgment delivered by Mr. Justice Willes, held that the words "loss or damage arising from collision or other accidents of navigation occasioned by default of the master or crew, or any other accidents of the seas, rivers and steam navigation, of whatever nature or kind, excepted," did not exempt the owner from negligence in omitting to take out and dry the cargo at a port of distress, because the authorities (specially mentioning *Grill*

v. *General Iron Screw Colliery Co.*, above cited,) " and the reasoning upon which they are founded are conclusive to show that the exemption is from liability for loss which could not have been avoided by reasonable care, skill and diligence, and that it is inapplicable to the case of a loss arising from the want of such care and the sacrifice of the cargo by reason thereof."

In *Gill* v. *Manchester &c. Railway*, L. R. 8 Q. B. 186, the Court of Queen's Bench, applying the same rule of construction, held that a provision in a contract for the carriage of cattle by railway, by which the railway company was not to be responsible for any loss or injury to the cattle " in the receiving, forwarding or delivering, if such damage be occasioned by the kicking, plunging or restiveness of the animal," did not relieve the company from liability for negligence of its servants in delivering a restive cow.

In *Lloyd* v. *General Iron Screw Colliery Co.*, above cited, Lord Bramwell said that the words " accident or damage from machinery, boilers, steam," could not apply to an explosion caused by the wilful act of the engineer. 3 H. & C. 292.

The passages quoted by the respondent from *Burton* v. *English*, 12 Q. B. D. 218, 220, 223, as showing that the words " on deck at owner's risk " exempt the carrier from liability for unlawful jettison or for negligence of the master and crew, were *obiter dicta*, the only point decided being that those words did not exclude the right of the owner of the goods to recover in general average for a lawful jettison. See *Ralli* v. *Troop*, 157 U. S. 386, 396. The two other cases cited by the respondent were cases in which railway companies were held not to be responsible for the negligence of their servants under contracts essentially different from that now in question. One was an action by a passenger travelling as a drover accompanying cattle under a free pass, one of the terms of which was that he should travel at his own risk. *McCauley* v. *Furness Railway*, L. R. 8 Q. B. 57. The other was an action by a person who, knowing that the defendant had two rates of carriage, a higher rate when it took the ordinary liability of a carrier, and a lower rate when it was

relieved from all liability except that arising from the wilful misconduct of its servants, delivered goods to be carried at the lower rate under a contract in which the only words defining the carrier's liability were "owner's risk." *Lewis* v. *Great Western Railway*, 3 Q. B. D. 195.

Upon consideration of the conflicting testimony, with the aid of the careful arguments of counsel, no ground is shown for reversing or modifying the conclusions of fact reached by both courts below. Their concurrent decisions upon a question of fact are to be followed, unless clearly shown to be erroneous. *Morewood* v. *Enequist*, 23 How. 491; *The Richmond*, 103 U. S. 540, and cases cited; *The Conqueror*, 166 U. S. 110, 136.

By the facts so found, it appears that the cattle, for the loss of which a recovery has been permitted, were sound and uninjured animals, forcibly thrown or driven overboard, in rough weather, by order of the master, from unfounded apprehension on his part, in the absence of any pressing peril to the ship, and with no apparent or reasonable necessity for a jettison of the sound cattle, and no attempt to separate them from those which had already been injured by perils of the sea.

The clauses of the bill of lading, (other than the reference to British law,) on which the respondent relies, are those in the first paragraph, "on deck at owner's risk; steamer not to be held accountable for accident to, or mortality of the animals, from whatever cause arising;" and those in the third paragraph, by which "it is also mutually agreed that the carrier shall not be liable for loss or damage occasioned by causes beyond his control, by the perils of the sea, or other waters;" "by barratry of the master or crew;" or "by collisions, stranding, or other accidents of navigation, of whatsoever kind, even when occasioned by the negligence, default, or error in judgment of the pilot, master, mariners or other servants of the shipowner."

The bill of lading itself shows that all the cattle to be carried under this contract were to be on deck. The words "on deck at owner's risk" cannot have been intended by the

parties to cover risks from all causes whatsoever, including negligent or wilful acts of the master and crew. To give so broad an interpretation to words of exception, inserted by the carrier and for his benefit, would be contrary to settled rules of construction, and would render nugatory many of the subsequent stipulations of the bill of lading.

The wrongful jettison of the sound cattle by the act of the carrier's servants cannot reasonably, or consistently with the line of English authorities already cited, or with our own decisions, be considered either as an "accident to, or mortality of the animals," or as a "loss or damage occasioned by causes beyond his control, by the perils of the sea, or other waters," or yet as a loss or damage "by collisions, stranding, or other accidents of navigation." There having been no collision, stranding, or other accident of navigation, there was nothing to which the only stipulation in the bill of lading against the consequences of negligence, default, or error in judgment of the master and crew, could apply.

There was no barratry, because there was neither intentional fraud or breach of trust, nor wilful violation of law, one of which, at least, is necessary to constitute barratry. *Patapsco Ins. Co.* v. *Coulter*, 3 Pet. 222; *Lawton* v. *Sun Ins. Co.*, 2 Cush. 500; *Grill* v. *General Iron Screw Colliery Co.*, above cited.

The facts of the case, therefore, do not bring it within any of the exceptions of the bill of lading, assuming them to be valid.

*Decree affirmed.*