## THE OLGA S.

(District Court, E. D. Louisiana. December 4, 1925.)

No. 16943.

1. **Shipping** ⊝⟶105—**Cargo delivered at ship side according to contract was at carrier's risk.**

Cargo which was delivered at ship side in accordance with contract for delivery to vessel as fast as she could receive it, and which had been receipted for by master, was at the carrier's risk.

2. **Shipping** ⊝⟶120—**Ship held liable for logs permitted to lie alongside overnight, while ship was lying in open roadstead.**

Under Harter Act (Comp. St. §§ 8029–8035), ship was liable for mahogany logs delivered at ship side in accordance with contract, where loss to no small extent was due to negligence and want of skill, and lack of prudence by master in permitting logs to lie alongside overnight, while ship was lying in open roadstead.

In Admiralty. Libel by the Talge Mahogany Company against the steamship Olga S. Decree for libelant, with reference to commissioner in the event of no agreement on the amount of damages.

Dart, Kernan & Dart, of New Orleans, La., for libelant.

Terriberry, Rice & Young, of New Orleans, La., for claimant.

BURNS, District Judge. Libelant seeks to recover damages from the steamship Olga S for the loss of 34 mahogany logs delivered to the steamer at Frontera, Mexico, for New Orleans, under a contract of affreightment. By the terms of the contract the logs were to be ready for delivery promptly on the arrival of the steamer at Frontera, the logs to be delivered alongside steamer and in reach of ship's tackle in the water, free of expense to the steamer, "as fast as steamer can receive, Sundays and legal holidays excepted." This stipulation was repeated in a postscript reading: "Cargo to be delivered to vessel as fast as she can receive it, Sundays and legal holidays excepted."

The claimants admit the execution of this contract, admit the receipt of the 141 logs, and admit that 34 of the said logs went adrift from alongside the ship during the night of April 1–2, 1922. The claimant denies, however, that the logs were delivered to the ship in accordance with the contract; the alleged improper delivery consisting in the fact that they were delivered to the ship faster than the ship could receive them; as a second defense, that the loss of the logs

10 F.(2d)—51

was due to perils of the sea; that at or about 2 a. m., on Sunday, April 2, a strong wind, causing a heavy sea, blew up, with a strong current, which caused the loss, for which they are relieved of responsibility under the Harter Act (Comp. St. §§ 8029–8035); and, finally, that the loss was due to the negligence of the shippers who rafted the logs because the timber dogs, consisting of a ring pin driven into each log, through which a raft chain was passed, pulled out of the logs by the working of the logs in the rough sea alongside the ship, and thus set them adrift.

The contention is that under section 3 of the Harter Act (Comp. St. § 8031) the ship is not responsible for any loss resulting from any act or omission of the shipper, or owner of the goods, his agents or representatives, so that, if the loss of logs was due to the pulling out of the ring dogs, or timber pins, the responsibility for this was on the shipper, because the rafts were made up by the shipper; or, if the loss was caused either by the insufficient strength of the timber raft, made up by the shipper, or by a peril of the sea, in either case the ship is not responsible—and they rely on a decision of the Circuit Court of Appeals for the Second Circuit in Munson Steamship Line v. E. Steiger, 136 F. 772, 69 C. C. A. 492, which decision is to the effect that, where a vessel is lying in open roadstead, at Frontera, from two to three miles off shore, where the logs are rafted by ropes passing through ring dogs, with a mother rope made fast to the ship, and while thus attached the logs break away from their rafts under a condition of weather which was to be anticipated, or because the dog rings or ropes were not strong enough to meet the strain of rough weather, or because the dog rings were insufficient, or not sufficiently fastened to the dogs, through negligence of the shipper, the ship could not be held responsible for the carelessness in that respect.

Libelant claims to be sustained by the evidence in the record in its contention that the liability is with the ship. It relies on the proposition that, from the time the logs were delivered to the ship and receipted for by the ship, they were entirely under the control of the servants of the ship, tied to the ship with lines furnished by it. It meets the defense of improper delivery by urging that the claimant, as owner of a general ship, such as the Olga S, carrying goods for hire, is a common carrier; that the responsibility of the shipowner for the goods at-

taches as soon as they are delivered to the servants of the ship, even though not loaded on board, and that the rights of the parties are covered by their contract of affreightment, and not by a bill of lading subsequently issued; that as such common carrier the ship carried the liability of an insurer against all losses, excepting only those due to two irresistible causes, loss caused by God and public enemies; that the liability of the ship as a public carrier commenced from the moment the logs were delivered—citing Bulkley v. Naumkeag Steam Cotton Co., 24 How. (65 U. S.) 386, 393, 16 L. Ed. 599; The Gracie D. Chambers, 253 F. 182, 165 C C. A. 82, affirmed in 39 S. Ct. 149, 248 U. S. 387, 63 L. Ed. 318; Liverpool Steam Co. v. Phenix Insurance Co., 9 S. Ct. 469, 129 U. S. 397, 437, 32 L. Ed. 788; Carver on Carriage by Sea (7th Ed.) § 251. Libelant also cited The Pokanoket (D. C.) 161 F. 383, and 172 F. 321, 96 C. C. A. 383, 24 L. R. A. (N. S.) 569; Insurance Co. of North America v. North German Lloyd Co., 110 F. 420, 49 C. C. A. 1; Campbell v. The Sunlight, 2 Hughes, 9 Fed. Cas. No. 2,368.

As to the defense of peril of the sea, the libelant contends that neither the contract of affreightment nor the bill of lading contains any clause excepting the ship from liability caused by peril of the sea or other accidents, and insists that under the Harter Act (27 Stat. 445) the carrier is liable for negligence in the handling of the cargo, whether during loading, or during the voyage, or during unloading, and he cannot protect himself against such negligence by stipulation; that the burden of proof is on the shipowner to show that the loss or damage to cargo delivered to him for transportation was occasioned by peril of the sea—citing The Folmina, 29 S. Ct. 363, 212 U. S. 354, 361, 53 L. Ed. 546, 15 Ann. Cas. 748; Clark v. Barnwell, 12 How. 272, 13 L. Ed. 985; The Jeanie, 236 F. 463, 472, 149 C. C. A. 515; Compania De Navigacion La Flecha v. Brauer, 18 S. Ct. 12, 168 U. S. 104, 118, 42 L. Ed. 398, where the Supreme Court held that the ordinary contract of a common carrier by sea involves an obligation on his part to use due care and skill in navigating the vessel and carrying the goods, and an exception in the bill of lading of perils of the sea or other specified perils does not excuse him from liability for loss to which the negligence of himself or servants had contributed.

Libelant also cites The Gulnare (C. C.) 42

F. 861, 862, where Judge Billings held that encountering heavy seas is not a peril of the sea, within the meaning of a policy of marine insurance; also The Arctic Bird (D. C.) 109 F. 167, which defines a peril of the sea as such extraordinary perils as cannot be guarded against by the ordinary exercise of human skill and prudence; The City of Alexandria (C. C.) 28 F. 202; The Edwin I. Morrison, 14 S. Ct. 823, 153 U. S. 199, 211, 38 L. Ed. 688; Ralli v. New York & T. S. S. Co., 154 F. 286, 83 C. C. A. 290 (C. C. A. 2d).

The law and the evidence in this case seems entirely with the libelant. The evidence is that, several days after the ship arrived and anchored, about 2½ miles off shore, and off the mouth of the river, in the Frontera roadway, for a general cargo of mahogany logs, including the 500 tons contemplated by the contract of affreightment with libelant, on March 30, the shipmaster notified libelant's agent by letter: "I am now ready to start loading your logs in No. 1 and No. 2 holds. Therefore be kind enough to bring your cargo alongside."

On the next day, Friday, about 6:30 a. m., libelant delivered 76 logs in a raft, which was tied alongside the ship, opposite No. 1 and No. 2 holds, and obtained the ship's receipt for the logs then delivered. On the following morning, Saturday, April 1, two rafts, the first containing 35 logs, and the second 30 logs, were likewise delivered and receipted for, making a total of 141 logs delivered.

The master had been previously ashore on the river and saw the logs in the river. He knew their size and condition, and he made no objection to receiving them. Nor did he make any objection as to the manner or time of delivery, or the condition of the rafts. He had previously, some time before his inspection of the logs, given ear to local rumor that the logs he was to receive had been rejected for carriage, because of their size and weight, by other ships. There is evidence that he was influenced by this into a cantankerous frame of mind. He had never carried mahogany logs before, and had no experience with them. He was peculiarly antagonistic to libelant's agent, a Mr. Fitzgerald, who, to placate him and overcome his insistence that his booms could not sustain the strain of logs weighing more than three tons, engaged to procure a special boom from a ship's agent ashore, and rig same on his ship to lift the heavier logs aboard, at libelant's extra expense.

The first raft, delivered on Friday, had been lifted aboard ship and placed in the holds. Other logs also had been and were being loaded for another shipper. During Friday afternoon the base of the special or heavy lifting boom, consisting of a green mahogany block, split. On Saturday morning a new base block was furnished, but was not rigged in place and conditioned for use until late Saturday afternoon. This caused some delay in loading.

Meanwhile the loading operations had continued by the use of the ship's own booms, and, although preference was given to the smaller logs, many logs were lifted of considerably more than three tons' weight without damage to the ship or its rigging. The stevedores, who were engaged by the claimant's agent, worked until 5 o'clock Saturday evening. The master admitted that a number of another shipper's logs weighed considerably more than 3 tons. One weighing about 8 tons was loaded with the ship's own gear without the use of the special boom, and without damage to the ship, and therefore he could have loaded the largest of the libelant's logs, which did not weigh more than 6 or 6½ tons, without trouble.

On Saturday evening, the evidence shows that, although the ship was lying in the open roadstead, at a season when stiff breezes or even gales might be expected, some 34 or 35 of libelant's logs, abreast of the forward holds, and a number belonging to another shipper, further aft, were permitted to lie alongside as they were when the stevedores knocked off. Some derangement must have been caused by the picking from the several rafts of logs according to size, the preference being given the smaller sized logs, and there must have been a number of ring dogs detached from the logs already loaded, hanging to the raft chain, attached to the ship's mother rope.

So far as the evidence shows, no effort was made to safeguard the rafts, which were to lie in this open seaway all night, subject to the action of any swells or disturbances that might be caused and should be expected. No effort was made to tow or cause them to be towed back to harbor in the river. Neither was any objection or protest made as to the time and manner of delivery, whereby the shipper might have been put on notice, or at least afforded an opportunity to protect the logs at its own expense.

During the evening a fresh northeast breeze had sprung up and a heavy swell began to run. It strengthened as the night wore on, and yet there is nothing in the evidence to show that the condition of the logs was examined or prepared for the wind and wave or swell, which increased as the night wore on.

At some time after 2 a. m. of Sunday morning, the testimony is that the watchman aroused the master and others aboard ship, who came on deck, learned that the logs were drifting loose, when, according to the evidence, they were unable to minimize the damage because of the rubbing and rolling of the logs and the presence of sharks in the water. No boat was launched, nor was any other effort made to save the drifting logs, or secure those yet intact. At daylight a motorboat from shore went out and picked up several logs, which proved to belong to another shipper. The remainder were drifted back astern of the ship to prevent further loss. Search was made, but the majority of the logs adrift were not found.

On the following day the master diligently made formal protests before the American consul, and notations on the bill of lading he subsequently issued with the self-serving declaration that "during the night, between 2 and 3 o'clock, the wind went from north to northeast, and a heavy swell set in from the sea, with a hard current, which caused the timber dogs to pull out of the logs, and part of them went adrift. In the darkness of the night and roughness of the sea, we were unable to bring the logs back again"—resting upon his declaration in the protest that the loss was due to wind and weather, heavy seas and currents being the cause of the loss of the logs.

The captain and mates, claimant's witnesses, testify that the ship's ropes did not break; that they were in good condition; that at least one rope was hauled aboard with ring dogs attached, from which they infer that the motion of the logs in the swells pulled the ring dogs which were left attached to the chains, and this in turn to the ship's rope. This opinion evidence, however, is discounted by the fact that more convincing evidence shows the loss of considerable raft chain, and that, as the logs were detached as picked for loading, the ring dogs must have been pulled or knocked out, and for that purpose must have remained hanging to the chains and ropes.

[1, 2] The conclusion is that from the time of delivery at shipside, according to contract, the cargo was at the carrier's risk; that, whilst the loss was due proximately

to the action of the wind and waves, it was none the less due to no small extent to the negligence and want of skill and the lack of exercise of common prudence by the master. The liability is therefore on the ship and its owners.

There will accordingly be a decree for libelant, and, in the event of no agreement upon the amount of damages, the cause to be referred to a commissioner. Costs to follow decree.