### THE KRONPRINZESSIN CECILIE.

#### (District Court, D. Massachusetts. February 1, 1916.)

#### No. 1069.

1. SHIPPING ⬅115—AUTHORITY AND DUTIES OF MASTER—NONDELIVERY OF SHIPMENT.

On July 28, 1914, a German steamship sailed from New York for Bremerhaven, Germany, via Plymouth, England. On the evening of July 31st, when about 1,000 miles from Plymouth it changed its course and returned to an American port. The master had knowledge of such historical facts, conceded to have preceded the outbreak of the European war, as occurred before the sailing of the steamer, and of facts thereafter occurring, indicating that his country was upon the verge of war with Russia, France, and England, and just before changing his course received a wireless message from the steamship company stating that war had broken out and directing him to return to New York. War had not in fact been declared at that time. *Held*, that he was justified, and acted with a due regard for the safety of his ship, passengers, and cargo, and his deviation from the direct course of his voyage was not a breach of the contract with a shipper, though it was claimed that the steamship could have reached Plymouth, to which the shipment was consigned, before war was declared.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 226, 433; Dec. Dig. ⬅115.]

2. SHIPPING ⬅115—AUTHORITY AND DUTIES OF MASTER—NONDELIVERY OF SHIPMENT.

As the master acted in accordance with the dictates of his own prudence and sagacity, the fact that what he did was with the approval of the shipowners and in concurrence with their views did not prejudice him or the ship.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 226, 433; Dec. Dig. ⬅115.]

3. SHIPPING ⬅115—AUTHORITY AND DUTIES OF MASTER.

So far as shippers and passengers are concerned, the master of a ship was bound to act upon his own judgment, to be exercised in good faith on their behalf, in determining whether to abandon a voyage because of information that war was imminent, and instructions from the shipowners would not protect him.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 226, 433; Dec. Dig. ⬅115.]

4. SHIPPING ⬅115—NONDELIVERY OF SHIPMENT—OUTBREAK OF WAR.

On July 31, 1914, the directors of a German steamship company learned that a declaration of a state of war would be made public at once, and later on the same day such declaration was brought to their knowledge. From information as to a steamship's supply of coal, it was considered necessary to decide that afternoon whether the steamship should be di-

rected to abandon its voyage from New York to Bremerhaven, and, though war had not actually been declared, a wireless message was sent to the master, informing him that war had broken out with England, France, and Russia, and directing him to return to New York. The message was sent in this form upon the idea that a mere statement announcing that a state of war had been proclaimed might not convey the full import of the actual imminence of war to the captain. *Held* that, under the circumstances, the message was not an untruthful one, or one calculated to deceive, or to cause the captain to take action which he ought not to have taken, and was justified.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 226, 433; Dec. Dig. ⊂⇒115.]

In Admiralty. Libel by the Guaranty Trust Company of New York against the steamship Kronprinzessin Cecilie, claimed by the North German Lloyd. Libel dismissed.

Kirlin, Woolsey & Hickox, of New York City, and Blodgett, Jones, Burnham & Bingham, of Boston, Mass., for libelant.

Choate, Larocque & Mitchell, of New York City, Choate, Hall & Stewart, of Boston, Mass., Joseph Larocque and Walter C. Noyes, both of New York City, and Joseph D. Bedle, of Jersey City, N. J., for claimant.

HALE, District Judge. In this case, No. 1069, the Guaranty Trust Company of New York seeks to recover damages for breach of contract, by the steamship, in failing to carry a consignment of gold from the port of New York to the port of Plymouth, England. The libel alleges that on July 27, 1914, the steamship was lying in the port of New York, bound for Bremerhaven, Germany, by way of Plymouth, England; that on that date the libelant delivered to the steamship in good order and condition 93 kegs of gold bullion, of the agreed and declared value of $4,942,936.64, to be carried to Plymouth, England, thence to be forwarded to London, to be there delivered in like good order and condition to the order of the libelant, in consideration of $9,268, prepaid freight; that the steamship delivered to the libelant a bill of lading therefor; that, in violation of her contract, the steamship, when about 900 miles from Plymouth, abandoned her voyage and put back to Bar Harbor, Me., where, on or about August 8, 1914, the libelant accepted redelivery of the 93 kegs of gold from the steamship, under an agreement that such redelivery should not constitute a waiver of libelant's claim for breach of contract. By reason of such failure of the steamship to deliver the gold at Plymouth, the libelant says, it has suffered damage exceeding the sum of $1,104,467.43. The libel is subsequently amended, increasing the amount claimed as damages to $1,793,278.22; and the libelant says that no part of this sum has been paid.

The answer admits the receipt of the 93 kegs of gold bullion, and alleges that the carriage of the same was undertaken by the claimant subject to the conditions and exceptions contained in the bill of lading, which is made a part of the answer, subject also to the possibility of the ship being prevented from concluding her voyage and being forced to put back into a port of refuge, in case of outbreak, or threatened outbreak, of the European war. It admits that the steamship turned back on her course, and says that at the time of turning back she was

about 1,070 miles from Plymouth. It alleges that the decision of the master to return to a port in the United States was based upon credible information received by him from the North German Lloyd office at Bremen by wireless message that war had broken out, involving Germany and Russia, France, and England, and that this message, considered in conjunction with the information with respect to the European crisis received by him prior to sailing, furnished reasonable ground for him to apprehend that the steamship and cargo would be captured if she continued on her voyage, and required him, in the exercise of sound judgment and discretion, to put back to a port of refuge; that, though war had not actually broken out at the time of the receipt of this wireless message, still the master, in anticipation of an outbreak of hostilities, and the consequent danger of arrest of the members of his crew, the arrest or probable detention and discomfort of his passengers, and the capture of his ship and cargo, was fully justified in adopting the course which he did adopt.

The answer denies that the steamship violated any contract, or any other duty. It admits that, on or about August 8, 1914, the libelant accepted redelivery of the gold; it alleges that such redelivery was at the libelant's special request; it denies that by reason of the alleged failure of the steamship to deliver the gold at Plymouth the libelant has suffered any damage.

As a second defense, the answer details the facts in connection with the attachment of the gold, the incidents of the voyage, and the danger of capture, had the ship proceeded on her voyage. It alleges that the action of the captain in directing the return of the steamship to the United States was in concurrence with instructions from her owners; that such instructions and the action following them were fully justified by the circumstances, and were the exercise of a right given by the laws of the United States, as well as by the German Maritime Code. The answer further alleges that the course followed by the captain was successful; that his return to a port of refuge, and the delivery of the specie to the parties entitled to it, were accomplished without the capture or detention of a single passenger or member of the crew, and without loss or damage to any of the specie, or to any other part of the cargo.

As a third defense, the answer asserts an exception in the bill of lading against liability for the loss or damage "occasioned by arrest and restraint of princes, rulers, or people."

As a fourth defense, the answer alleges a provision in a bill of lading whereby neither the ship nor carrier should in any case be responsible for a value greater than that declared by the shippers in the margin. It sets out the value of the shipment as already stated; that all the gold representing the shipment, and the value thereof, was redelivered by the claimant to the libelant at Bar Harbor; that upon such redelivery all responsibility of the claimant, and of the ship, came to an end.

As a fifth defense, the answer alleges that it was agreed that time should not be of the essence of the contract; that the bill of lading expressly providing that the steamer should have "liberty to call at

intermediate ports, or any port or ports in or out of the customary route in any order, to receive and discharge coal, cargo, passengers, and for any other purposes"; that it was also agreed that the steamer should have liberty to put into a port of refuge; and that neither the steamer nor carrier should be liable for "loss or damage by prolongation of the voyage."

Certain facts are stipulated with clearness and brevity: The libelant is a corporation organized under the laws of the state of New York, having its office in New York and a branch office in London. The claimant, North German Lloyd, is a corporation organized under the laws of Bremen, existing under said laws, and the laws of the German Empire, and is the owner of the Kronprinzessin Cecilie. The steamship was built in 1907 at a cost of about $4,500,000. On July 27, 1914, the libelant shipped on board the steamer 93 kegs, containing gold bars owned by the shipper, of the value, at the time and place, as set forth in the libel. By the terms of the contract the gold was to be carried by the steamer from New York to Plymouth, England, thence to be forwarded at the steamer's expense, but at the owner's risk, to London, unto the Guaranty Trust Company of New York, or its assigns, subject to the provisions and exceptions of the bill of lading, which I need not recite in full, but to which I may make further reference. This bill of lading was delivered to, and accepted by, the libelant as the contract of carriage, covering the shipment. The steamer was fully manned, outfitted, and equipped, and sailed on the voyage from New York on July 28, 1914, about 1 o'clock in the morning. She continued on the voyage until the night of July 31st at about 9 minutes past 10 o'clock in the evening, ship's time, when she turned back towards New York. At the time of turning back, the steamer was in the position of 46 degrees and 46 minutes north latitude, and 30 degrees 21 minutes west longitude from Greenwich, a distance of about 1,070 nautical miles from Plymouth. Just before turning back, about 10 o'clock in the evening, a wireless message was received on board of the steamer from the directors of the North German Lloyd at Bremerhaven, in private code. The translation of the message reads as follows:

"War has broken out with England, France and Russia. Return to New York."

It was signed by the managing directors of the North German Lloyd. This wireless message was sent out by the managing directors of the claimant company, after the publication of the decree of threatened danger of war, after having been informed of the intention of the government to dispatch on that day the notes to Russia and France which are referred to in the German White Paper, after a general warning by the admiralty to the German merchant marine, and after the directors had received reliable information that a declaration of a state of war had been perfected and would shortly be proclaimed.

After turning back, the steamer proceeded in a westerly direction towards the United States, and put into Bar Harbor, Me., on August 4, 1914, where she dropped anchor about 4 o'clock in the morning.

By arrangement between the parties and the Navy Department of the United States, the steamer was afterwards moved to Boston Harbor, where she now lies. On August 8, 1914, the claimant redelivered to the libelant, at Bar Harbor, Me., the 93 kegs of gold bars, being all the gold which the claimant had received from the libelant for carriage to England. On November 17, 1914, the claimant, without admitting liability, refunded to the libelant $1,544.67, being the proportion of the prepaid freight covering the inland transportation of the libelant's gold from Plymouth to London; the acceptance of this refund by the libelant being without prejudice to its claim against the steamship and her owners for their alleged failure to deliver the gold in accordance with the terms of the contract.

Certain historical facts are agreed upon, as part of the proofs. Those stipulated as having happened before the ship sailed from New York are as follows: On June 23, 1914, Archduke Francis Ferdinand, of Austria, and his wife, the Duchess of Hohenberg, were assassinated at Sarajevo, the capital of Bosnia. On July 23d Austria sent an ultimatum to Servia, the terms of which appear in the German White Paper and the British White Paper. On July 24th Russia urged that Austria abandon the time limit of her ultimatum—

"in order to prevent consequences equally incalculable and fatal to all the Powers which might result from the course of action followed by the Austro-Hungarian government."

The Russian government informed the other Powers that, if the Austro-Hungarian government should make war on Servia, Russia could not allow the conflict to be settled between those two countries alone. The French ambassador at St. Petersburg gave the English ambassador at St. Petersburg to understand—

"that France would fulfill all the obligations entailed by her alliance with Russia, if necessity arose, besides supporting Russia strongly in all diplomatic negotiations."

The German government emphasized to other Powers its opinion that there is only question of a matter to be settled exclusively between Austria-Hungary and Servia, and that other Powers ought to reserve it to those two, because interference of another Power, owing to different treaty obligations, would be followed by incalculable consequences. On July 25th Austria declined the Russian request for extension of time limit in ultimatum to Servia. Servia replied to the Austrian ultimatum at 6 p. m. The terms of the reply are shown in German and British White Papers. Austria advised Servia and the other Powers that she considered Servia's reply unsatisfactory. The Austrian minister left Belgrade at 6:30 p. m. The Servian government moved from Belgrade to Nish the same evening. Germany confined her Alsace-Lorraine garrisons to barracks, and placed the frontier works of Alsace-Lorraine in a complete state of defense. The populace in Berlin made demonstrations in favor of war; Servia ordered mobilization; Russia began to take military precautions; martial law was proclaimed in Austria. On July 26th Austria severed diplomatic relations with Servia, and sent passports to the Servian minister.

Austrian mobilization against Servia was decreed. Austria advised Russia that she sought no territory of Servia, and did not intend to impair the sovereignty of that country, but that, aside from that, she was prepared to go to the "furthest extremes" to obtain satisfaction of her demands. The Austrian ambassador at Washington instructed consuls in the United States to tell reservists to prepare to return home for service. The Servian army began mobilization. There was a panic in Belgrade as the people fled from the city. American tourists left Carlsbad and other resorts. Belgium increased her army to enforce neutrality. The German fleet was concentrated in the home waters. Germany indicated to her railroads the measures preparatory for concentration. Germany urged the other Powers not to interfere with Austro-Hungarian plans to discipline Servia. The German ambassador at St. Petersburg was directed to make the following declaration to the Russian government:

"Preparatory military measures by Russia will force us to counter measures which must consist in mobilizing the army. But mobilization means war. As we know the obligations of France towards Russia, this mobilization would be directed against both Russia and France. We cannot assume that Russia desires to unchain such a European war. Since Austria-Hungary will not touch the existence of the Servian kingdom, we are of the opinion that Russia can afford to assume an attitude of waiting. We can all the more support the desire of Russia to protect the integrity of Servia, as Austria-Hungary does not intend to question the latter. It will be easy in the further development of the affair to find a basis for an understanding."

The Russian Secretary of War gave the German military attaché his word of honor that no order to mobilize had been issued, merely preparations were being made, but not a horse mustered, nor reserves called in. If Austria-Hungary crossed the Servian frontier, such military districts as are directed toward Austria, namely Kiev, Odessa, Moscow, Kazan, would be mobilized; under no circumstances those on the German frontier, namely, St. Petersburg, Vilna, Warsaw. He added that peace with Germany was desired very much. The military attaché told the Secretary that Germany appreciated Russia's friendly intentions, but considered mobilization, even against Austria, as very menacing. Sir Edward Grey proposed to the Powers a conference in London between himself and the ambassadors of Germany, France, and Italy for the purpose of discovering an issue that would prevent complications. If agreed to, the representatives of these Powers were to request authorities at Belgrade, Vienna, and St. Petersburg to suspend active military operations pending results of conference. Russia asked Austria to take back her ultimatum, and modify its form, and, if this were done, offered to guarantee the result. Russia informed Italy that the Austrian-Servian conflict could not be localized. Austria notified the Powers that the refusal of Servia to accept the Austrian demands in full, without reservations, would compel Austria to force Servia by the most drastic measures to a complete submission. Russia announced that she could not be asked to allow Servia to be crushed. The German fleet in Norway put to sea, and Austria ordered partial military and naval mobilization. On July 27th, Germany completed requisitions, and placed her covering troops in posi-

tion in Alsace-Lorraine. Russia notified Austria that, if war broke out between Austria and Servia, Russia would not give way. The Vienna and Budapest bourses closed. A skirmish occurred on the Danube between Austrian and Servian forces. England stated to Germany that, if Austria, notwithstanding the terms of the Servian reply, should invade Servia, she would prove she wished to crush a small state. This would raise a European question, and a war would ensue in which all the Powers would take part. France, Italy, and Russia agreed to Sir Edward Grey's proposal of the 26th for a conference of ambassadors in London. State of war declared in Russian province of Kovno. Belgian army was mobilized. Shots were fired by a Cossack patrol on a German patrol at the Russian frontier. The Fourteenth corps of the French army discontinued maneuvers, and returned to its garrison. Information to this effect was received in Berlin. Germany refused Sir Edward Grey's proposal for a conference of ambassadors at London. The Czar informed the crown prince of Servia, if all efforts for peace failed, Russia would not disinterest herself in the fate of Servia. Russia proposed to Austria that desired modifications in latter's demands on Servia be the subject of direct conversations between St. Petersburg and Vienna.

The proofs show that a newspaper called the Ocean Gazette was printed on the steamship, and that on July 29th a copy of the paper contained a wireless dispatch from London announcing that:

"A formal declaration of war was made by Austria on Servia to-day and active hostilities between the two countries have already begun. Two Servian steamers were to-day attacked on the Danube, the Servian colors hauled down, and the Austrian colors hoisted.

"Germany has declined the proposal of Sir Edward Grey for a conference of ambassadors of the Powers in London; Austria also formally declined the proposals. Orders for the German fleet to concentrate in home waters have been issued, and the British first and second battle squadrons are in readiness for service.

"A dispatch from Berlin says a Russian force has occupied positions near the frontier of Russian Poland and that a squadron of German cavalry has also advanced to the frontier.

"Emperor Franz Josef has granted complete amnesty to all Austro-Hungarian subjects who have deserted from the army or who emigrated to other lands to avoid military duty."

The text of Austria's declaration of war was also printed. On July 31st, the Ocean Gazette published another wireless dispatch from London:

"Germany sent an ultimatum to Russia, demanding an explanation for the latter's mobilization. The answer is to be given within the next 24 hours.

"Fighting between Austrian and Servian forces is reported to-day at several points and the invading forces are meeting with stout resistance. Dispatches received at the Servian legation in London say that the Austrians were repulsed, while trying to cross the Danube 20 miles east of Belgrade and at Losnitza, west of Belgrade.

"The southern column of Austrians in Bosnia is reported to be watching the Montenegrin troops. In a severe battle at Fotcha, in Bosnia, the Austrians defeated the Servians with several hundred killed on each side.

"The gravity of the international situation is recognized in all European capitals.

"Russia proceeded with her mobilization of a large number of troops, while the French defensive forces took extensive precautions.

"Business was practically suspended on the London Stock Exchange to-day, pending the serious war situation. Dealers refused to make prices. The consols reached a record low price of 69½, the lowest in a century. Seven failures were reported to-day. St. Petersburg, Vienna, Budapest, and Brussels Exchanges also remained closed; two failures were announced on Glasgow Exchanges.

*    *    *    *    *    *    *    *    *    *

"The Shinbum, a semiofficial newspaper of Japan, declares to-day that, if England is attacked, Japan will give assistance to the British arms.

"*Washington.* Administration officials are awaiting additional developments in European politics. If other nations than Austria and Servia are drawn into the conflict, probably a proclamation of neutrality covering the entire situation will be determined upon by the State Department."

Captain Polack, the master of the steamship, testified that he had followed the sea since 1875; he had been in the North German Lloyd service since 1886; he had been a master since 1900, and in command of this steamship since May, 1913. When he took command of the ship, he was given a sealed package, and was instructed to open the package at any time in the future in case he received a message, signed "Siegfried" and relating to some disease. On July 31st, at 10 o'clock in the evening, ship's time (11:45 Greenwich time), a wireless message was brought to him on the bridge by the chief officer. The message was in German, and it related that somebody had fallen sick; it was signed "Siegfried." Upon opening the sealed package, he found a code which enabled him to translate the wireless message as follows:

"War has broken out with England, France, and Russia. Return to New York." (It is in evidence that the translation from the German of the last clause is more literally "*Turn back* to New York.")

The name Siegfried meant "the board of directors of the North German Lloyd." After he had opened and read the message, the captain testifies, he immediately gave orders to turn the ship around toward the west; he had kept in touch with the situation before sailing, and knew in a general way how critically events had been developing; and, while on the water, he had felt anxiety as to receiving some message informing him of present conditions. He had discussed the matter with his chief officer the night of July 30th, and was very anxious to "get news from home about the political situation, and about this war," and had asked other ships about war news, so that, when he received the message, he assumed that the home office was fairly well informed as to the situation. He was then asked what appealed to his judgment upon receipt of the message as to the best course to pursue. He answered:

"Well, after receiving that message which read, 'War has broken out with England, France, and Russia,' there was only one way to do, to go back to the United States, to the west—not to run into any danger."

[1-3] 1. Was the master of the steamship justified in turning the ship about, deviating from his direct course, and proceeding westward? The libelant alleges that he was not justified; that, in fact, he exercised no discretion about the matter, and acted merely under or-

ders from his managing directors; and that, under the maritime law, and under his contract, the conduct of the master and of the ship was unjustifiable. The answer raises the sharp contention that:

"The return of the Kronprinzessin Cecilie to a port of the United States was not only a justifiable precaution, but was based upon reasonable ground for apprehension of capture, and was the performance of an obvious duty which the master owed to his owners, to the passengers and crew and to the cargo owners, and was a measure adopted by him in good faith, in the exercise of his best judgment and discretion, for the benefit of all concerned."

I have already stated the facts which may fairly be held to be within the knowledge of the ship, and of the master, at the time of turning back on July 31st, at 10 o'clock in the evening. The master has testified that he kept in touch with the situation of affairs up to the time of sailing, and that on the voyage he had, from time to time, received information by way of the Sayville wireless station in regard to the progress of events; that this information was published in the Ocean Gazette; that he was awaiting information from the owners by wireless; and that, when he received his message on the evening of July 31st, he acted, not only in accordance with his instructions, but in accordance with the dictates of his own best judgment, which was to go back to the United States, "and not to run into any danger."

In The Styria, 186 U. S. 1, 19, 20, 22 Sup. Ct. 731, 738 [46 L. Ed. 1027], these facts were disclosed:

"The Styria, an Austrian steamship sailing from Trieste by way of Sicilian ports to New York, took on board at Port Empedocle, Sicily, a quantity of sulphur for New York. Before sailing the master learned that war had broken out between Spain and the United States, and as sulphur was an article contraband of war he had the sulphur all unloaded and warehoused at Port Empedocle before sailing. The court holds that the master of the Styria was justified in relanding and warehousing the contraband portion of the cargo, and that in so doing he had reasonable regard for the interests of both ship and cargo."

Speaking for the Supreme Court, Mr. Justice Shiras referred to the fact that a suggestion had been made by the District Court, and repeated in argument by the libelants, to the effect that the master was guided in his action in discharging the contraband cargo by a telegram from agents in London, "rather than by his own judgment on all the circumstances known to him at the time." In disposing of this contention, the learned Justice said:

"Without transcribing all of the master's testimony, but having read and weighed it, we are of the opinion that it clearly shows that, while he carried out the instructions of the agents, his judgment, on the facts confronting him, was that it was not safe for him to proceed with a contraband cargo, nor proper to wait indefinitely for the uncertain results pending negotiations between Italy and Spain. His conduct, as we have already said, had due regard to the interests of all concerned in the ship and in the cargo, both that which was contraband and that which was not so. So far as the shipowners were concerned, he had the approval of the managing agents; so far as the shippers and consignees were concerned, he acted upon his own judgment, exercised, apparently in good faith, on their behalf. * * * Without protracting the discussion, we are of the opinion that the master was justified in landing and storing the cargo that had become contraband by reason of the outbreak of the war between Spain and the United States, and by the Spanish proclamation of April 23d; that, having acted reasonably, with due regard to

the interest of all concerned in so doing, it was not made his duty, by the facts brought to his notice, to reship the sulphur on the Styria and further delay his voyage."

In Nobel's Explosives Co. v. Jenkins (1896) L. R. 2 Q. B. Div. 326, the case showed that a general cargo ship sailed from London to Yokohama with a cargo of dynamite, which was contraband of war. On arriving at Hongkong the master landed the cargo, after cabling for instruction from the owners of the vessel, for the reason that war had been declared on that day between China and Japan. It was held in the Queen's Bench Division that the probability of capture of the cargo steamer on the 1,000 miles of sea between Hongkong and Yokohama justified the shipper in refusing to carry the cargo beyond Hongkong. In giving the judgment of the court, Matthew, J., observed:

"Apart from the terms of the bill of lading, it seems to me that the conduct of the captain would be justified by reference to the duty imposed upon him to take reasonable care of the goods intrusted to him. Whether he has discharged that duty must depend on the circumstances of each case, and here, if the goods had been carried forward, there was every reason to believe that the ship would be detained and the goods of the plaintiff confiscated. In the words of Willes, J., in Notara v. Henderson, L. R. 7 Q. B. 225, at page 234, 'a fair allowance ought to be made for the difficulty in which the master may be involved.' * * * It was said that the master was not an agent for the shippers, because they had protested against the discharge of the goods. But, even if this information had reached the captain, it would not have divested him of his original authority and discretion as agent in any emergency for the owners of the ship and the other owners of the cargo."

This case was cited and followed in The Styria, where, after quoting a considerable part of the opinion, Mr. Justice Shiras said:

"The master consulted the owners of the ship before he acted, but also acted in reference to the duty imposed upon him to take reasonable care of the goods intrusted to him. The master, in either case, would have acted imprudently if he had not secured the approval of the shipowners, if it were possible to get it before the emergency was over; and all that can be said is that there was a concurrence of judgment between the ship agents and the master as to what was the proper course to pursue."

In The Teutonia, L. R. 4 P. C. 171, the case disclosed these facts:

A suit was brought in the admiralty by a Liverpool firm against a Prussian brig whose owner, master, and crew were all Prussians, for breach of a charter party entered into by the master and a branch of the Liverpool firm at Valparaiso, by which the master agreed to carry a full cargo of bags of nitrate of soda from Pisagua, South America, to Cork, Cowes, or Falmouth, as he might elect, and thence to such port as the Liverpool firm might order between Havre and Hamburg and there deliver the cargo.

The bill of lading contained an exception against the act of God, the queen's enemies, fire, and all and every other dangers and accidents of seas, rivers, and navigation of whatever nature and kind soever; but the decision of the case was not based on this exception.

The ship with her cargo arrived at Falmouth on July 10, 1870, and while there the master heard rumors that war was probable between France and Prussia.

On July 11th, the master received orders to proceed to the port of Dunkirk and there deliver the cargo, and at once set sail for Dunkirk, and arrived at a distance of about 14 miles off that port at 12 o'clock at night on July 16th, which was Saturday.

After lying to for about two hours, a pilot came on board, and the master asked him about the war as to which he had heard rumors at Falmouth. The pilot told him that war had been declared two days before. He then asked the pilot where he could bring him in safety, and the pilot offered to take him to Flushing, or the Downs, or wherever he liked.

The master thought it prudent to proceed to the Downs, and he anchored off there on Sunday morning, the 17th. He could get no advice or information on that day; and on Monday, the 18th, he went ashore at Deal, and was told by the German consul that war had broken out between France and Prussia. He then telegraphed to the owner, who was his father, and received an answer on Tuesday, the 19th, forbidding him to go to Dunkirk, and, on the same day, took his vessel into Dover, the nearest and safest port.

On July 19th the French declaration of war was delivered to the Prussian government at Berlin, which was known the same day by telegraph in England.

The Privy Council held that the master, when he was informed on his arrival off Dunkirk by the pilot, although incorrectly, that war had been actually declared two days before, was entitled to pause and to take a reasonable time to make further inquiries, and that he did not exceed the limits of a reasonable time in making inquiries.

In giving the judgment of the Privy Council, Lord Justice Mellish observed:

"If the master had entered Dunkirk, and it had turned out that war had been previously declared, he would have entered it with notice that he was entering an enemy's port, and this would have obviously exposed his ship to condemnation, and might have exposed himself to severe penalties when he returned to his own country. It seems obvious that, if a master receives credible information that, if he continues in the direct course of his voyage, his ship will be exposed to some imminent peril, as, for instance, that there are pirates in his course, or icebergs, or other dangers of navigation, he must be justified in pausing and deviating from the direct course, and taking any step which a prudent man would take for the purpose of avoiding the danger. And their Lordships agree, if authority was wanting, that the case of Pole v. Cetcovich, 9 C. B. (N. S.) 430, is an authority in point."

See The San Roman, L. R. 5 P. C. 301; Embiricos v. Reid & Co., L. R. 3 K. B. 45; The Heinrich, L. R. 3 A. & E. 424; The Wilhelm Schmidt, 25 L. T. N. S. 34.

In the case at bar, Captain Polack, the master of the steamship, was examined before me at length, and was subjected to a very able and critical cross-examination. He impressed me as being a truthful man and a faithful, trustworthy shipmaster. He showed a clear appreciation of the trust imposed in him. The proofs lead me to the conclusion that, on the evening of July 31, 1914, as he stood upon the bridge of his ship, he had knowledge of the events, just referred to in detail, up to the time of the sailing of the ship from New York; that he had knowledge, also, of the important events which had happened after the ship left New York, and which were published in the newspaper printed on the steamship. He knew that Austria had declared war on Servia, and had commenced active hostilities; that Germany and Austria had declined the English proposal for a conference of the Powers in London. The facts within his knowledge tended to the conclusion that his country was upon the very edge of war with Russia, France, and England. In addition to this knowledge, he now receives information from the owners of the ship that war has broken

out between Germany, England, France, and Russia. He is within 1,070 miles of Plymouth, England. If he proceeds much further, there will not be sufficient coal left in his bunkers to return to the United States.

It is true, then, in the case at bar, as it was in the case of The Teutonia. that the shipmaster had received credible information that, if he continued in the direct course of his voyage, his ship would be exposed to an imminent peril. Upon the information which Captain Polack received, and the facts within his knowledge, he acted, I think, with a reasonable apprehension of impending danger. He was justified in deviating from his direct course eastward; and in doing this he was acting with a due regard for the safety of his ship, his passengers, and his cargo. In the light of what he knew, his clear duty was to turn about at the time he did. He was also instructed by the owners of the ship to turn about; and, if the case were one arising between him and the shipowners, those instructions might well be held, within certain limitations, to be conclusive. But, as between the parties to this controversy, those instructions were not decisive. They would not protect him if harm came to those who had intrusted their lives and property to his care and fidelity. They should not prejudice him now, in these proceedings. The message received by the captain did not consist of instructions alone; it contained a statement of an important fact. It is clear that the shipowners thought it necessary to give facts for their captain's guidance, as well as to give him instructions. By giving him such facts, they showed that they still relied upon his discretion; they recognized that he was captain of their steamship, and they did not expect a slavish following of arbitrary orders. But, whatever the communications between the master and the shipowners, the passengers and the shippers were not concluded by these communications. This libelant had the right, and is now seeking to enforce the right, to look to the ship and to its master. The master's instructions did not add anything to his duty in reference to the care of the ship, passengers, and cargo; they did not subtract anything from that duty. In an emergency, he must act for the protection of all interests committed to his care. Captain Polack was situated in this respect much as was the captain of the Styria. In what he did he had the approval of the shipowners; he acted in concurrence with their views. So far as the shippers and passengers were concerned, he was under the duty to act upon his own judgment, to be exercised in good faith on their behalf. In The Styria, Mr. Justice Shiras clearly defined the duties of the master of a ship at sea:

"The master of a ship is the person who is intrusted with the care and management of it, and the great trust reposed in him by the owners, and the great authority which the law has vested in him, require on his part and for his own sake, no less than for the interests of his employers, the utmost fidelity and attention. Abbott on Shipping (7th Am. Ed.) 167. * * * 'All will agree that the master must act in good faith and exercise his best discretion for the benefit of all concerned.' New England Insurance Company v. The Sarah Ann, 13 Pet. 400 [10 L. Ed. 213]; The Amelia, 6 Wall. 27 [18 L. Ed. 806]."

In the Ancient Laws of the Sea it was said:  ·

"When voyages are undertaken, the master is put in by the owners, and they ought to make good the master's fact and deed; and therefore as the .whole care and charge of ship and goods are committed to the master, it is the prudence of the owners to be careful who they will admit commander of their ship."

It is argued by the learned proctors for the libelant that, in the progress of these later years, shipowners are able to communicate with their ships by wireless, and to control them; that, for this reason, there is a tendency in the courts to limit the great power of a master of a ship at sea. There was much interesting discussion touching this matter at the hearing of the cause. It is urged in behalf of the libelant that a shipmaster in command of a vessel operating as a common carrier, in the absence of immediate and compelling necessity, has no authority or discretion to vary the shipowner's contract of carriage, or to depart from his voyage. The Julia Blake, 107 U. S. 418, 2 Sup. Ct. 692, 27 L. Ed. 595, is brought to my attention as a leading authority. That case arose upon a suit by the holder of a bottomry bond against the ship, her cargo and freight. The Julia Blake had been damaged by stress of weather, and forced to put into St. Thomas for repairs, where her cargo was unloaded. It would have been possible to forward the cargo at reasonable expense by some other vessel to New York; instead of forwarding the cargo, the master hypothecated it and the freight, upon bottomry bond, to the Bank of St. Thomas; he did this without communicating with the cargo owners. Upon the arrival of the ship at New York, the bond was not paid. The Supreme Court held that the master of a ship cannot sell nor hypothecate the cargo, except in case of urgent necessity; that in the case of the Julia Blake, no such necessity appeared; and the cargo owners were not liable. In speaking for the court, Mr. Chief Justice Waite observed:

"He [the master] acts for the owner of the cargo because there is a necessity for some one to do so, and, like every agent whose authority arises by implication of law, he can only do what the owner, if present, ought to do. Necessity develops his authority and limits his powers. What he does must be directly or indirectly for the benefit of the cargo, considering the situation in which he has been placed by the acceptance of the voyage. * * * 'But at all events the necessity, must be such as to connect the act with the success of the voyage, and not for the exclusive interests of the shipowner.' * * * 'All will agree that the master must act in good faith, exercise his best discretion for the benefit of all concerned, and that it can only be done upon the compulsion of necessity, to be determined in each case by an actual and impending peril to which the vessel is exposed.'"

Further in his opinion, after considering the circumstances of the case, the Chief Justice said:

"It must have been easy to see that to repair the vessel at the risk of the owner of the cargo would be to place his interests in jeopardy, without any urgent necessity on his account. No master who 'held the balance evenly between his two principals' could have believed himself justified, under the circumstances, in hypothecating the cargo for any such purpose, without notice to the owner."

So far as it goes, I think, the case of The Julia Blake states the law in substantial accordance with the law of The Styria, and of the

other cases to which I have called attention. In The Julia Blake, the court was not dealing with the case of a master in an unexpected emergency; and the court found that the circumstances of that case did not justify the master in hypothecating the cargo. The case does not take away from the captain his power to act under a reasonable discretion, or his power to exercise his judgment in case of emergency for the protection of all the interests committed to him. My attention is especially called, also, to the case of Brauer v. Compania Navigacion La Flecha (D. C.) 57 Fed. 403, where Judge Addison Brown held that the master was not justified in making a jettison in the absence of any compelling necessity, and upon mere apprehension of danger. Here, again, the court found that the circumstances did not warrant the act of the master, where he had sacrificed a deckload of cattle in bad weather without present necessity, solely from apprehension of further storms, and when there was "no reasonable or apparent necessity for this sacrifice." The case was affirmed by the Supreme Court. 168 U. S. 104, 18 Sup. Ct. 12, 42 L. Ed. 398. Other important and interesting cases have been brought to my attention, among others Codwise v. Hacker, 1 Caines, 526, and The Roebuck, 2 Asp. Mar. Law Cas. N. S. 387. Many cases to the same point are cited. Another class of cases is urged upon my consideration where the courts have held that mere fear of war does not justify a breach of a maritime contract. Among these cases are Atkinson v. Ritchie, 10 East, 530; Forster v. Christie, 11 East, 205; Richardson v. Maine Ins. Co., 6 Mass. 102, 4 Am. Dec. 92; King v. Delaware Ins. Co., 6 Cranch, 71, 3 L. Ed. 155. In the case last cited, the Supreme Court adverted to the danger of holding that false intelligence, received on a voyage, might justify a captain in acting as if that intelligence were true. Upon a careful consideration of all the cases brought to my attention touching the subject, I am persuaded that the law is nowhere better declared than in the cases of The Styria, The Teutonia, and Nobel's Explosives Co. v. Jenkins. These cases state the rule clearly, I think, that, apart from the terms of any maritime contract of carriage, a shipmaster at sea is under a plain duty to take care of all interests intrusted to him; he is justified in deviating from his direct course, when in reasonable apprehension of imminent peril; and the courts are to apply the test whether, in any case, and under any emergency, the master has discharged his duty, under all the circumstances of each case. Upon this subject other courts have quoted the words of Willes, J., in Notara v. Henderson, cited by Matthew, J., in the case of The Nobel's Explosives Co. v. Jenkins:

"A fair allowance ought to be made for the difficulties in which a master may be involved. * * * The place, the season, the opportunity, and means at hand, the interests of other persons concerned in the adventure, and whom it might be unfair to delay for the sake of the cargo in peril, in short, all circumstances affecting risk, trouble, delay, and inconvenience, must be taken into account."

In that case the learned judge held that any information which had reached the master of the ship could not divest him of his original authority and discretion as agent, in an emergency, for the owners of

the ship, and owners of the cargo. The learned proctors for the libel-ant have in a most learned and interesting manner discussed the cases cited by them bearing upon this subject; but I think there is nothing further in the cases to which I need call attention.

In the case at bar there is clearly nothing to change the rule with reference to the duty of the master of this steamship at the time of the emergency in which he was called to act, when he turned the ship about and proceeded westward. The proofs show, I think, that he acted, not only with a due regard to his communication from the own-ers of the ship, but in accordance with the dictates of his own prudence and sagacity. His conduct is justified under the rules laid down in the cases to which I have referred. It is justified, too, by the test of "urgent necessity," and of the "compulsion of necessity," as those tests have been made by Chief Justice Waite and Judge Addison Brown, in the cases brought to my attention by the learned proctors for the li-belant. If it be assumed, as urged in behalf of the libelant, that the parties made their contract of carriage, on July 27th, in contempla-tion of the 'possibility of war, it is clear that they did not make the contract with knowledge of the progress of events during the three days before the vessel was turned about; and it was upon all his knowledge upon July 31st, and all the information which he then ob-tained, that the master of the ship based his action.

As he steamed westward, the testimony discloses that he proceeded with care and discretion. He caused the side lights and the masthead lights to be extinguished, the portholes to be darkened, and the curtains to be drawn down on the promenade deck, to keep the light from shin-ing out of the lounge and smoking room. He painted the tops of the smokestacks black, to make the ship appear to be a White Star boat. From intercepted wireless messages, he had reason to think he had acted wisely in turning about. On August 1st, at 9:40 in the evening, he received a wireless message, sent by way of Sayville, to all ships of the German Society for Wireless Telegraph. The dispatch was in the German code, and was thus translated:

"Threatening danger of war; do not touch at any port England, France, Russia."

On August 3d, at 1:30 in the afternoon, the English cruiser Essex was heard in connection with Halifax by wireless. As the click of the Essex became more distinct, indicating her approach towards the Cecilie, it became impossible to tell whether or not the British ship was patrolling the coast of Long Island; and it was thought that some other British war vessel might be cruising along the coast in the vi-cinity of Boston. It appeared to Captain Polack that to approach either New York or Boston might involve danger; he therefore called his officers together for a conference, and it was decided to change the ship's course, to proceed towards the Banks, then run for Frenchman's Bay, and put into Bar Harbor. This he did. The ship arrived safely at Bar Harbor on the morning of August 4th, at 6 o'clock.

[4] 2. Were the managing directors of the North German Lloyd justified in sending the wireless message to the ship:

"War has broken out with England, France, and Russia; return to New York"?

Upon this point, the proofs show the progress of events up to the time of turning westward. It is not necessary to refer in detail to all these events. The stipulation also gives the statement of the directors and officials of the claimant. It appears from that statement that the directors tried to decide what was the latest time the steamship would have to receive a message in regard to the continuation or interruption of her journey; the Lloyd's nautical department reached the conclusion that according to the supply of coal on hand, and the duration of the trip, the board of directors would have to come to a decision, at the latest, during the early hours of the afternoon of July 31st. It was thought that, owing to the congestion of the cable and wireless connections, some time would elapse from the sending of the wireless message to its reception on the ship. The imminence of war was fully in the minds of the directors. Accordingly they delegated Baron von Plettenberg, a member of their board, to go to Berlin for information. As late as July 30th there was apparently some hope indulged that war might be averted; but by the evening of that day a general warning was issued to the merchant marine through the admiralty staff. This warning was apparently the first official sign to the directors that war was inevitable; this caused them to begin to send telegraphic messages to their ships in regard to further procedure. Just before 2 o'clock, on July 31st, Baron von Plettenberg sent telegraphic information that the declaration of a state of war would at once be made public. Later in the afternoon "the declaration of a state of war for the German Empire, owing to the threatening danger of war," was brought to the knowledge of the directors. On the basis of this telegraphic advice, the wireless message was sent to Captain Polack. The decree of a state of war was designated as the decisive fact inducing the directors to send the message which they sent. It appears in the record that a "state of war" means that the country is put upon a war basis, but not that war has actually been declared. It is urged by the learned proctors for the libelant that the message announcing that war had broken out was an untruthful one; that it put a false color upon the matter, and caused the captain of the ship to deviate from his course, and break his contract, when there was no necessity for such action. The reasons assigned by the directors for saying "war has broken out," instead of "war is imminent," are given as follows:

"The reasons why we stated in our telegram to the Cecilie that the war had broken out, whereas, up to that time, as a matter of fact only the proclamation of a state of war, owing to the threatening danger of war, had been issued, are the following:

"First of all, according to the proclamation of the state of war, of which Baron von Plettenberg advised us, the breaking out of this threatened war within the next 24 hours could be expected with the greatest probability.

"Secondly, we stated ourselves, when sending off the telegram, that every other information in regard to the political situation, every statement that was not absolutely clear and comprehensive in regard thereto, was inadvisable, and could only lead to misunderstanding and unsafe resolutions.

"The sole information that the state of war had been proclaimed would

228 F.—61

probably have been incomprehensible to the Captain, who, of course, would not have been familiar with the regulations of political law.

"Only the information that war had already broken out could show him the political situation in the same degree of distinctness and clearness with which we viewed it here, and told him to observe in the further guidance of the vessel the deportment and care which we considered absolutely necessary here, just as if the war had actually broken out here.

"Furthermore, we had to count on quite a long period of transmission for our telegrams, during which time, therefore, a further aggravation of the situation in the direction of war was to be expected, and we also had to take into consideration that, if the breaking out of war had actually occurred, it would most probably have been impossible for us to advise the vessel of this at that time on account of the isolation or interruption of the telegraphic connections.

"The wording of our telegram, therefore, occurred purposely in the form that we reported the war as already having broken out, and has nothing to do with the wording of our telegram code."

The proofs make it clear that the directors knew and realized that war was imminent, that the event would happen which did happen, and that the telegraphic information from Baron von Plettenberg had brought them to that conclusion. Their decision was, in my opinion, a reasonable one; they apparently proceeded upon the idea that a mere statement announcing a state of war to have been proclaimed might not convey the full import of the actual imminence of war to Captain Polack, more than 1,000 miles away upon the sea. Their conduct indicates that they recognized the necessity of giving the captain of their steamship something more than an arbitrary order; that they knew the responsibility of turning the ship about was upon him. They could not give him the history of the last three days, upon which their conclusion was based. And therefore these directors thought it necessary to translate their knowledge of the impossibility of escape from war into a statement that war had broken out. Under all the circumstances, I am persuaded that their message cannot be held to have been an untruthful one, in that it was calculated to deceive, or in that it tended to cause Captain Polack to take action which he ought not to have taken. Upon the whole evidence, I am of the opinion that the directors were justified in sending their wireless message. Before Captain Polack received it, the German Emperor had issued his proclamation declaring a state of war in the German Empire. That proclamation was:

"We, William, by the grace of God, German Emperor, King of Prussia, etc., decree by virtue of article 68 of the Constitution of the German Empire, in the name of the Empire the following the imperial territory, with the exception of the royal Bavarian territory, is hereby declared to be in a state of war. This decree goes into effect with its publication."

The general mobilization of the French army occurred on the following day, August 1st. On the same day, Germany declared war against Russia. The German ambassador, at St. Petersburg, by direction of his government, on July 26th, had said:

"But mobilization means war; as we know the obligations of France towards Russia, this mobilization would be directed against both Russia and France."

Germany's declaration of war against Russia might well be thought to be substantially equivalent to a declaration of war against France. On August 3d a state of war was declared to exist between Germany and France, and the French ambassador was handed his passports. On August 4th England declared war against Germany. On August 5th Austria declared war against Russia.

It is urged on the part of the libelant that, if the Cecilie had continued on her course, she could have arrived at Plymouth with her cargo of gold, and that the steamship was bound to complete the performance of her contract with the Guaranty Trust Company, even though such completion of the contract involved the certainty, or the overwhelming probability, of subsequent capture. The contention is not made that the steamship could have arrived at Bremerhaven until after the declaration of war against Russia, and after the declaration of war against France. In fact, I believe the learned proctors for the libelant admit the extreme improbability that the steamer could have arrived safely at Bremerhaven. The proofs clearly show that, whether or not the steamship could have arrived safely at Plymouth, it is clear that she could not have arrived at Bremerhaven until after war had been declared, and it would have been practically certain that she would have been seized by a hostile force. Under the general scope of his authority, the shipmaster is under the same duty to protect his ship, and the other interests intrusted to his care, as he is to protect his cargo. Those who have committed their interests to him must be presumed to have done so with the knowledge of such duty of the shipmaster, and of the ship. The Teutonia, L. R. 4 P. C. 171; The Styria, 186 U. S. 1, 22 Sup. Ct. 731, 46 L. Ed. 1027.

It is not necessary, however, to decide what would have happened if the steamship had proceeded on her voyage. It is sufficient to say that the claimant's directors acted with a reasonable apprehension of imminent peril, when they sent the wireless message to their captain. They must be judged by the information within their reach at the time of sending the message. When so judged, their conduct must be held to be reasonable and justifiable. In view of my conclusion, I need not consider other questions presented by the pleadings.

I have already found that, in turning his ship about, the master acted with due regard to the safety of all interests intrusted to him, and under a reasonable apprehension of imminent peril; that, in view of his knowledge, and of credible information received by him, he did as a prudent shipmaster should have done.

I come to this conclusion without considering the terms of the bill of lading, for the reason that the master was justified in his action by the duty imposed upon him under the maritime law.

The libel is dismissed, with costs.