## SIDERACUDI *v.* MAPES.

(*District Court, S. D. New York.* ——, 1880.)

1. PILOT—LIABILITY.—A pilot is responsible to the owner of a vessel for negligence or default in the performance of his duty.

2. SAME—DUTY.—When a pilot takes charge of a vessel at sea, to bring her into port, his duty is to stay by her, unless discharged, till she reaches her destination or some place of safety.

3. SAME—DISCHARGE.—A discharge, however, will not avail him, when the same has been procured by an untrue statement, though with no wrongful intent, in respect to a matter touching the safety of the ship, on which the master had a right to rely.

4. SAME—JURISDICTION.—When damage results from such omission of duty, the pilot is guilty of a marine tort, and is subject for the same to the jurisdiction of a court of admiralty.

*W. Mynderse,* for libellant.

*G. A. Black,* for respondent.

CHOATE, D. J. This is a libel brought by the master of the Austrian bark Jenny against the respondent, a licensed pilot, to recover damages sustained by the vessel from ice while lying at anchor in the Hudson river, off Thirty-fourth street, on the night of February 14, 1879. The proofs show that on that day the respondent boarded the bark at sea, as she was approaching this port, and offered his services as pilot; that her destination, as then communicated to him, was the Atlantic basin, Brooklyn; that at the quarantine station, Staten Island, a message from her consignees in the city changed her destination to a berth on the north side of the pier, at the foot of Thirty-Fourth street, North river; that she was in tow of a tug engaged by the master before the pilot boarded her; that when the destination was changed, the services of the tug were secured to take her to her new destination; that the respondent informed the master, when he was told of her new destination, that, as the tide would be on their arrival at the foot of Thirty-fourth street, she probably could not go into her berth until the next day. They proceeded to the foot of Thirty-fourth street. They found a good deal of ice along the docks on the New York side of the river,

and extending out for some distance, which was kept close to the shore by a strong westerly wind. They arrived there after sundown, when it was already dusk, and the slip was full of ice, which extended out into the river 200 feet or more. It was drift ice; not in large masses, but it would have required considerable time to have got her into the slip as things were. The tide was more than half ebb. The libel charges that she could have been safely put in her slip when she arrived, and that the respondent deceived the master as to the depth of the water there, and fraudulently misrepresented that there was not sufficient depth of water for her to go in safely. As to this charge of deceit and fraud, it is not borne out by the evidence. I think the proof is that the respondent in good faith concluded that it was not safe to attempt to put her into the slip as the tide then was, and that he is not chargeable with any fault in not trying to do so. And it appears that he could not do it without the help of the tug, and the master of the tug seems to have been unwilling to attempt it. Then followed some conference between the respondent and the master as to what should be done. The master seems to have proposed to be anchored in the river, off Thirty-fourth street. He asked the pilot if it was a safe place to anchor. The respondent answered that it was; and he brought the bark to an anchor near the middle of the river. The master then signed the pilot's card or bill, which indicated that he had finished his service, and dismissed the tug. The respondent left with the tug. This was about half-past seven in the evening. During the night the westerly wind died out, and the ice, coming down with the next ebb tide in great masses, surrounded the vessel and cut and injured her planks on and near the bow, so that they were nearly cut through. She was in great peril of being sunk, and, in the morning, put her flag at half-mast, to call assistance. By the aid of three tugs she was finally put into her berth on the north side of the Thirty-fourth-street pier.

The charge chiefly relied on by the libellant is that the vessel was left in this way at anchor in an unsafe place, without the respondent informing the master of the danger

to which he was exposed by the ice. The answer is that the respondent performed his whole duty to the vessel in anchoring her where he did; that it was a safe and proper place to leave her at anchor; and that he thought it to be so when he advised the master to have her anchored there.

It is clear that pilots are responsible to the owners of a vessel for their negligence or default in the performance of their duty. 1 Parsons Sh. & Adm. 118, 119, and cases cited. The laws of Oleron contain the following articles: "23. If a pilot undertakes the conduct of a vessel to bring her to St. Malo, or any other port, and fail of his duty therein, so as the vessel miscarry by reason of his ignorance in what he undertook, and the merchant sustain damage thereby, he shall be obliged to make full satisfaction for the same if he hath wherewithal; and if not, lose his head." "24. And if the master, or any one of his mariners, or any one of the merchants, cut off his head, they shall not be bound to answer for it; but, before they do it, they must be sure he had not wherewith to make satisfaction." 1 Laws of the Adm. 82. Chancellor Kent says, (3 Kent Com. 176, 12th Ed.:) "The pilot, while on board, has the exclusive control of the ship. He is considered as master *pro hac vice;* and if any loss or injury be sustained in the navigation of the vessel, while under the charge of the pilot, he is answerable as strictly as if he were a common carrier, for his default, negligence, or unskilfulness; and the owner would also be responsible to the party injured for the act of the pilot, as being the act of his agent."

Although the taking of the pilot is compulsory, and he supersedes the master in the navigation, yet the vessel is liable for his negligence. *The China*, 7 Wall. 53. In the case last cited the court say, (p. 67:) "The services of the pilot are as much for the benefit of the vessel and cargo as those of the captain and crew. His compensation comes from the same source as theirs. Like them he serves the owner, and is paid by the owner. If there be any default on his part, the owner has the same remedies against him as against other delinquents on board. The difference between

his relations and those of the master is one rather of form than of substance."

It has been held, though with considerable hesitation, in England, that the admiralty has no jurisdiction of a suit *in personam* against a pilot for damages from a collision caused by his unskilfulness, the suit being by the owner of the vessel injured, not the one which he had charge of. *The Alexandria*, L. R. 3 Ad. & Ec. 574, 582. The court followed the decision in *The Urania*, 10 W. R. 97, which appears to have proceeded partly on the ground that the pilot, having given a bond with a penalty, was liable only upon the bond, and partly on the terms of the English statutes conferring jurisdiction on the court. The New York pilots are required to give a bond for the faithful performance of their duty, but it is not for the benefit of those who may suffer from their negligence or want of skill, but for the purpose of providing rewards and the relief of vessels in distress. N. Y. Pilotage Act, §§ 11 and 22. It cannot be deemed, therefore, to have been intended to affect the remedies of others against them. In *Hobart* v. *Drogan*, 10 Pet. 108, it was held that the courts of admiralty had jurisdiction of suits by pilots for their fees, although they are appointed under state laws, and their compensation is fixed by the same laws, on the ground that the contract and the service were wholly maritime. It seems, also, that the present suit is for a marine tort—an act of negligence or omission of duty in violation of a maritime contract, from which resulted damage. The court has jurisdiction. The wrong done, if any, and the damage suffered, were wholly on the water.

On the merits the libellant is entitled to a decree. The very reason for having pilots at all is that they know the peculiar perils of the port, which are presumed to be unknown to the masters of vessels, and especially of foreign vessels. Without a pilot to protect the vessel against these dangers she is unseaworthy. When, therefore, a pilot takes charge of a vessel at sea, to bring her into port, his duty is to stay by her, unless discharged, till she reaches her destination or some place of safety. This duty is recognized by the re-

spondent, who answers that he left the vessel in a place of safety, and that he was discharged by the master. But if that discharge was procured by an untrue statement, though with no wrongful intent on the part of the pilot, in respect to a matter touching the safety of the ship, as to which the master had a right to rely on, and did rely on, his advice and representations, then the discharge cannot avail him. In the present case the danger to which the vessel was exposed in her anchorage was obvious and well known to the pilot. Ice of considerable thickness, and in quantities large enough to do damage to vessels at anchor, was afloat in the river, and only kept locked upon the New York shore by a high westerly wind, and other large masses of heavy river ice were liable to be dislodged and brought down with the tide. The continued security of the vessel during the night depended on this wind continuing, and on this alone. Nothing could be more uncertain of continuance. This peril, though known to the pilot, is presumed to be unknown to the master, and the contrary is not shown. When, therefore, the master asked if the anchorage was safe, it was the duty of the pilot to inform him of this possible and not improbable peril. If he had done so, and the master had seen fit to take the risk and dismiss the pilot, the pilot's duty would have been fully performed. I think the pilot had no wrongful intent, as charged in the libel, but he allowed the master to take risks from anchorage in this place upon his assurances of its safety, of which the master was entitled to be informed by him. This was negligence. Probably the pilot thought there was little chance of the wind changing in the course of the night; or, if it did, that so heavy a flow of ice would come down the river with the next ebb tide. But the relation of the parties was such as to call for a full statement of the danger, such as it was, before leaving the vessel or accepting his discharge, especially as he was directly interrogated on the point by the master. The damage that resulted was, I think, an injury resulting from this negligence of the pilot with sufficient directness to be attributed to it as a cause. If the master had been informed of the peril he could have required the

pilot to stay by till he could be brought into the slip and his voyage was ended, or he could have retained the services of the tug to aid him to remove his vessel if the wind changed, or he could have sought some more safe place at a different anchorage, or at a pier on the west side of the river. As it was, he was induced to let the pilot and the tug both go, and, practically, was deprived of all means of relief and escape from the danger till the next day.

It has been attempted to show that there was no safer place to which the vessel could have been taken during the night. I think the point is not sustained by the evidence, nor does it seem to be set up in the answer. But the presence of the pilot himself would have afforded some protection, and it is not shown that if he had given notice of the danger the vessel could not have escaped the damage which it has suffered. It was incumbent on the respondent to show that she could not. This he has not done. Fortunately the injury is very slight; it might well have been the sinking of the vessel and the loss of the cargo.

Decree for libellant, with costs, and reference to compute damages.