## THE FRAMLINGTON COURT.

### NEWFOUNDLAND EXPORT & SHIPPING CO., Limited, et al. v. UNITED BRITISH S. S. CO., Limited.

#### No. 7022.

Circuit Court of Appeals, Fifth Circuit. Feb. 12, 1934.

H. C. Hughes, of Galveston, Tex., and Henry N. Longley, of New York City, for appellants.

J. Newton Rayzor, of Houston, Tex., and Charles R. Hickox, of New York City, for appellee.

Before BRYAN, FOSTER, and HUTCHESON, Circuit Judges.

FOSTER, Circuit Judge.

Appellant, the Newfoundland Export & Shipping Company, Limited, through Wilkens & Biehl, disponents, chartered the steamship Framlington Court, of 2,989 tons net register, owned by appellee, the United States British Steamship Company, Limited, to carry a full cargo of newsprint paper in rolls from Corner Brook, Newfoundland, to Mobile, Ala., and Houston, Tex. The vessel loaded a full cargo of 7,596 rolls at Corner Brook and departed from that port, without taking a local pilot, at 8:45 p. m. on October 9, 1928. One hour and a half later, on her way to sea, she stranded on Woods Island, in Bay of Islands, about 12½ miles from Corner Brook.

Part of her cargo was jettisoned, and part was damaged by water, in relieving her of the strand and subsequently making necessary repairs. After considerable delay, the ship delivered what remained of the cargo, some in a damaged condition, at Mobile and Houston. A libel was filed in rem against the ship by appellant, on behalf of itself and various consignees of the cargo; the vessel was seized and released on bond.

The libel was brought on the contract, and simply alleged receipt of the cargo in good condition by the vessel and short delivery with damage to the remainder. Appellee filed answer, admitting receipt in good condition, damage, and short delivery of the cargo, but denied liability on the following grounds: That it had used due diligence to furnish a seaworthy vessel in all respects properly manned and equipped, and that she was in fact seaworthy; that the loss and damage to cargo was caused by stranding due to faults and errors in the management and navigation of the vessel by the master, officers, and crew; that it was relieved of liability for loss of cargo caused by stranding by an exception in the charter; that by another clause in the charter the ship had liberty to sail without a pilot. It was stipulated that the loss and damage of the cargo was caused by the stranding. Appellant contended that the stranding was caused by the unseaworthiness of the vessel at the inception of the voyage, as she was not properly manned without a local pilot on board to take her to sea. The District Court found that the master was competent to take the ship to sea and a local pilot was not necessary; that the ship was seaworthy and the stranding was caused by faults of navigation on the part of the master. A decree was entered dismissing the libel with costs. This appeal followed.

At the outset, without filing a motion to dismiss, appellee contends that the appeal should be dismissed for want of jurisdiction because no citation of appeal was served on the surety on a release bond for the vessel. Reliance is had on the case of Elliot v. Lombard (C. C. A.) 66 F.(2d) 662, recently decided by this court. In that case we concluded that a decree entered against appellant, who was claimant, and against the surety on a release bond, was a joint judgment. As the appeal was taken by the principal alone, with no severance or summons to the surety, we held the appeal should be dismissed. That case is not in point nor are other decisions to the same effect. It appears in this case that the appeal was taken during the term by

both libelant and the surety on a cost bond, proper security was given, service was accepted, and citation waived by counsel of record for the claimant. The only purpose of citation on appeal is to give the appellee notice in time to present his defenses. If the surety were to be considered a necessary party, the failure to serve it with citation would not divest this court of jurisdiction, and we could now have service made on such terms as might be just. Dayton v. Lash, 94 U. S. 112, 24 L. Ed. 33; Rector v. Alcorn (C. C. A.) 204 F. 748. But we do not think the surety on the release bond was a necessary party. The liability of the surety was contingent on a decree against the principal. As yet there is no such judgment. The surety was not a party of record in the lower court, and no judgment, either joint or several, was entered for or against it. The contention is entirely without merit. Payne v. Niles, 20 How. 219, 15 L. Ed. 895.

The issues presented require construction of the charter and a somewhat lengthy review of the evidence for their decision. As the testimony was all taken by deposition, out of the presence of the court, in reviewing the facts we are not embarrassed by the presumption usually indulged in favor of the conclusions of the trial court where he has seen and heard the witnesses. Fortunately there is not much conflict in the evidence as to most of the material facts.

So far as necessary to quote, the charter contained the following clauses:

"It is this day mutually agreed * * * That the said steamship, being tight, staunch and strong, and in every way fitted for the voyage, with liberty to take outward cargo for owners benefit, shall with all convenient speed sail and proceed to Corner Brook, Newfoundland * * * and there load a full and complete cargo of newsprint paper in rolls, quantity in master's option, etc; * * *

"It is also mutually agreed that the Carrier shall not be liable for loss or damage occasioned by causes beyond his control, by the perils of the seas or other waters, by fire from any cause or wheresoever occurring, by barratry of the master or crew, by enemies, pirates or robbers, by arrest and restraint of Princes, Rulers or People, by explosion, bursting of boilers, breakage of shafts or any latent defect in hull, machinery or appurtenances, by collisions, stranding or other accidents of navigation of whatsoever kind (even when occasioned by negligence, default or error in judgment of the pilot, master, ma-

riners or other servants of the ship owner, not resulting, however, in any case from want of due diligence by the owners of the ship or any of them, or by the Ship's Husband or Manager).

"It is mutually agreed that this contract is subject to all the terms and provisions of, and all the exemptions from liability contained in the Act of Congress of the United States, approved on the 13th day of February, 1893, and entitled 'An Act Relating to Navigation of Vessels,' etc.

"The steamer has liberty to call at any port in any order, to sail without pilots, to tow and assist vessels in all situations, and to deviate for the purpose of saving life and property. * * *"

All the above-quoted provisions of the charter appear in the printed form used in drafting it, which indicates they are customary and intended to govern usual conditions. In construing the charter it will be helpful to refer to certain general principles. At common law the liability of a common carrier is that of an insurer. And there is an implied warranty of seaworthiness in all contracts of carriage by water, whether the ship be a private or a common carrier. Before the passage of the Act of February 13, 1893, known as the Harter Act (46 USCA § 190 et seq.), common carriers by sea could not by any form of contract exempt themselves from liability for negligence of their servants. Knott v. Botany Worsted Mills, 179 U. S. 69, 21 S. Ct. 30, 45 L. Ed. 90. This was not so as to private carriers, and almost any exception could be incorporated in the agreement. The Framlington Court was a private carrier, a bailee for hire, as the charter was merely a contract of affreightment and not a demise of the ship. The master and crew remained in the service of the owner and were charged with full responsibility as to her management and navigation. A charter must be construed according to the intent of the parties as manifested by the whole instrument rather than by the literal meaning of any particular clause taken by itself. Crossman v. Burrill, 179 U. S. 100, 21 S. Ct. 38, 45 L. Ed. 106. The warranty of seaworthiness is not only implied but is express in the charter under consideration. It is a feature most important to the interests of the shippers. Any exception in the charter in favor of the shipowner is to be most strongly construed against him, especially if it tends to weaken the warranty of seaworthiness. The Caledonia, 157 U. S. 124, 15 S. Ct. 537, 39 L. Ed. 644; Compania de Nav. La. Flecha

v. Brauer, 168 U. S. 104, 18 S. Ct. 12, 42 L. Ed. 398. The Harter Act is a very comprehensive statute dealing with relations between vessel and shipper, and has been on the books for over 40 years. It has been frequently interpreted by the courts, and its meaning is well known in the shipping trade. Having incorporated the Harter Act by reference in the charter, the parties are bound to take it with its burdens as well as its benefits and it is controlling. Under the provisions of the act the shipowner is not liable for losses caused by faults or errors of navigation if he has used due diligence to make the ship seaworthy, but, if the loss occurs through the unseaworthiness of the ship, as distinguished from an error of navigation or management, in the absence of a valid special contract, he is not relieved of the absolute warranty of seaworthiness at the inception of the voyage. There is no material difference between the exemption from liability for stranding written into the charter and the provisions of the Harter Act. Under either clause, by necessary implication, the ship is liable if the owner has failed to use due diligence to make her seaworthy. But the clause giving liberty to sail without pilots is entirely inconsistent with the warranty of seaworthiness, and the obligation to use due diligence to make the vessel seaworthy, if failure to employ a local pilot would render the vessel unseaworthy at the beginning of the voyage. Under a reasonable construction of the charter, it could have no application as applied to the issues presented in this case. The Carib Prince, 170 U. S. 655, 18 S. Ct. 753, 42 L. Ed. 1181; The Irrawaddy, 171 U. S. 187, 18 S. Ct. 831, 43 L. Ed. 130; The Southwark, 191 U. S. 1, 24 S. Ct. 1, 48 L. Ed. 65; Atlantic Gulf & West Indies S. S. Line v. Interocean Oil Co. (C. C. A.) 31 F.(2d) 1006; Warner Sugar Ref. Co. v. Munson S. S. Line (D. C.) 23 F.(2d) 194, affirmed (C. C. A.) 32 F.(2d) 1021; The Cornelia (D. C.) 15 F.(2d) 245.

Seaworthiness is a relative term depending for its application upon the type of vessel and the character of the voyage. The general rule is that the ship must be staunch and strong and well equipped for the intended voyage. And she must also be provided with a crew, adequate in number and competent for the voyage with reference to its length and other particulars, and have a competent and skillful master of sound judgment and discretion. The Niagara, 21 How. 7, 16 L. Ed. 41; Northern Com. Co. v. Lindblom (C. C. A.) 162 F. 250; Adams v. Bortz (C. C. A.) 279 F. 521. There are very few published decisions on the question of whether a local pilot is necessary to complete the proper manning of a vessel when she leaves port. This is probably because pilotage is so universally customary and so generally compulsory at all ports of any importance throughout the world that very few vessels enter or leave a harbor without taking a pilot. The rule announced by the text-writers and supported by some earlier decisions, in substance, is this: Where pilotage is customary at a port, a pilot is available, and the nature of the navigation requires one, it is a breach of the warranty of seaworthiness if a pilot is not taken. Maclachlan, Law of Merchant Shipping (6th Ed.) p. 337; Carver, Carriage of Goods by Sea (6th Ed.) pp. 22–393; Abbott, Merchant Ships and Seamen (14th Ed.) vol. 1, pp. 491, 501; Parsons, Marine Ins. vol. 1, p. 384; Law v. Hollingsworth, 7 T. R. 160, 101 Eng. Rep. 909; Whitney v. Ocean Ins. Co., 14 La. 485, 33 Am. Dec. 595.

The rule is supported by sound reason. A pilot is employed because he is presumed to have knowledge of the tides and currents and their effects upon the ship and of all other dangers affecting the safety of the vessel due to local conditions. The master, however competent he might be to navigate his ship in the open waters of the ocean, would not be expected to have this knowledge. It is apparent that it would be as hazardous for a ship to attempt to follow a dangerous channel to sea without a competent hand on the tiller as it would be if the steering gear was defective. The reasons for employing a pilot were considered and stated about as above in Homer Ramsdell Transp. Co. v. French Line (C. C.) 63 F. 845, Comp. de Nav. Francaise v. Burley (D. C.) 183 F. 166, and in Sideracudi v. Mapes (D. C.) 3 F. 873. But the reasons are so plain that judicial statement of them is hardly necessary. The following cases, holding that in the circumstances disclosed the vessel was not unseaworthy without a local pilot, tend to support the rule: In The Oritani (D. C.) 40 F.(2d) 522, affirmed (C. C. A.) 54 F.(2d) 1075, it appears that a pilot was taken on leaving port but was dropped after the ship had been put upon a proper course and was considered in a safe position, and the master was himself competent as a local pilot. In Phillips v. Headlam, 2 B. & Ad. 380, 109 Eng. Reps. 1184, it appears a pilot was not available. However, a strong dictum supports the rule as applying to the departure of a vessel from a port.

We come now to a consideration of the facts. The record supports the following conclusions: Corner Brook is situated on Humber Arm, a narrow inlet which runs from the

southeastern extremity of Bay of Islands to the mouth of Humber river. The bay indents the western coast of Newfoundland at about 49° north latitude and is something over 20 miles in extent in each direction, with two other main arms extending from it north of Humber Arm. Woods Island, where the stranding occurred, is about 3 miles long, approximately 1½ miles across at the widest part, and lies with its eastern end a little over 1 mile from the entrance to Humber Arm at Frenchman Head. Humber Arm is about one mile and a half at the widest point, but at other points is not over a mile in width. Corner Brook is located a little over 10 miles from Frenchman Head. Humbermouth is another port on the same arm about 2 miles further inland than Corner Brook. The usual route for vessels leaving Corner Brook for the United States is to take what is called the western passage to the south of Woods Island and leave the bay at South Head. There are lighthouses at South Head, at White Point, a little less than a mile inland, at Frenchman Head, and at Meer Point on the arm, about halfway between Frenchman Head and Corner Brook. There are no lights on Woods Island and no fog signals anywhere in the bay or on Humber Arm. There is ample depth of water for large vessels in the bay and arm, but a number of shoals extend out from the shores. Practically undisputed testimony tends to show that pilots and ship masters of long experience in the bay do not attempt to navigate Bay of Islands in a fog, or a rain or snow squall, which are considered just as bad. They either anchor or return to Corner Brook. The land around the shores of Bay of Islands and on both sides of Humber Arm is hilly, casting land shadows. Woods Island is comparatively low. At night land shadows are confusing to navigators, as they have a tendency to give the impression that the ship is nearer land than she really is. There are currents in the Bay of Islands, which vary in force and direction according to the wind. The currents are described as being like a river running 10 to 12 feet beneath the surface. The compass is not to be relied upon in the vicinity of Frenchman Head, owing to an iron cliff on Blow-Me-Down Mountain about 4 miles away. Experienced pilots depend upon the echoes from the ship's whistle more than upon the compass.

The pilot limits in the Bay of Islands and Humber Arm are fixed by law at from South Head to Humbermouth, which includes Corner Brook and Woods Island. A pilot station is located at Frenchman Cove, a short distance from Frenchman Head. All vessels in and out of Corner Brook and Humbermouth are required by law to take or pay a pilot, except vessels of the Royal Navy, the Royal Yacht Club, coasting and fishing vessels. It is usual when a ship subject to pilotage enters the bay at South Head for some one to telephone to the pilot station. A pilot then goes out in a motorboat and meets the ship somewhere in the vicinity. Pilots are usually dropped at the same point on the outward voyage unless it is foggy or misty. The pilots have a code of whistle signals, and in that event the pilot boat follows the vessel out until the pilot deems it safe to leave her.

The Framlington Court came into the Bay of Islands at South Head in daylight in fine, clear weather. Neither her captain nor any member of the crew had ever visited the locality before. She took a pilot, Paul Young, at the usual place, and he proceeded to pilot her to Corner Brook. When he came on board, the wind was light and the sea calm. When she reached Corner Brook, the wind had freshened a great deal. Captain Tompkins, in command of the Framlington Court, was not satisfied with the efforts of the pilot to dock the ship, displaced him, and took command. However, he did not attempt to dock the ship himself, but took her across the arm and anchored until the wind subsided. The Framlington Court is a vessel of 4,886 gross tons, 360 feet in length, and was drawing over 19 feet when she left Corner Brook on the night of October 9, 1928. Pilot Paul Young was available to take her out, but her master decided to leave without him. He gave as his excuse for this that he did not consider him competent because he had been unable to dock the vessel and wanted to anchor her in 50 fathoms of water, and also that it would cause too much delay to slow the vessel down to put him off at Frenchman Head. According to the testimony of Captain Tompkins, the ship proceeded without difficulty until she had passed Frenchman Head. Her average speed would be about 10 knots an hour, but she was then making between 8 and 10 knots. After rounding Frenchman Head, he saw the light at White Point and brought it ahead. A few moments after that the light became obscured by a low lying mist. He continued at full speed, but altered his course 1¼ points, to allow for wind and current, bringing White Point light off the starboard bow. This new course was N. 40° West, magnetic. He considered this course safe. The ship proceeded on this course for about 2½ miles. At about 10:13 p. m. he noticed what looked like a streak of white fog on the water. He

306

gave the order hard astarboard. The ship swung a little to the southward of west and a minute after that she struck. She stranded on Woods Island. It appears from an entry in the chief officer's log book that at this time the weather was very dark and hazy with a southerly wind with a force 5-6 (19 to 31 miles an hour). The vessel made about 1 mile leeway in going ahead about 2½ miles. The master testified that the wind had very little effect on his ship but the strong current from a southerly direction caused her to strand. He did not know the exact force of the current. The leeway made was enormous.

■ There is considerable conflict in the evidence as to the state of the weather at the time the Framlington Court departed on the voyage from Corner Brook. The record shows the following evidence: No weather reports are kept at Corner Brook. Tompkins, master, and Starling, chief officer of the ship, testified that it was dark but clear when the ship left dock and until after she passed Frenchman Head. They are corroborated as to this by one disinterested witness as to Corner Brook and another as to Frenchman Head. On the other hand, six disinterested witnesses, who were in a position to observe, testified that the night was very dark and there were snow squalls, with light snow and drizzly rain, producing what was termed a Scotch haze. The testimony of these witnesses is clear and convincing. The third officer of the vessel and two seamen of her crew were on deck when she left dock. They were put on the stand by claimant, but not one of them was asked as to the condition of the weather when the ship left dock. The presumption may be indulged that had they testified the evidence would have tended to contradict the captain and chief officer. It further appears that the master and chief officer executed a protest at Corner Brook shortly after the accident in which it was stated that the night was dark but clear. However, it appears that this protest was extended at Mobile, some four months later, and the master, chief officer, chief engineer, and boatswain appeared before the notary. In this protest it is stated that at 8:45 p. m. when the ship sailed from Corner Brook there was a strong southerly wind and it was very dark and hazy. These conflicting statements tend greatly to weaken the probative force of the testimony of the master and chief officer and were admissible against the owner. The Potomac, 8 Wall. 590, 19 L. Ed. 511. Considering all the evidence, we are constrained to hold that a clear preponderance supports the conclusion that the night was dark and hazy at the time the vessel departed from Corner Brook.

■ There is no doubt pilotage is compulsory at Corner Brook for vessels such as the Framlington Court. The requirement that pilots be paid whether taken or not is sufficient penalty for compulsion. The Framlington Court paid pilotage in and out. The China, 7 Wall. 53, 19 L. Ed. 67; Homer Ramsdell Transp. Co. v. La Comp. Gen. Trans., 182 U. S. 406, 21 S. Ct. 831, 45 L. Ed. 1155. That pilotage is compulsory goes far to establish the custom of the port and also to indicate that the dangers of navigation require a local pilot. Of course, one reason for compulsory pilotage is to insure to the pilots sufficient compensation to warrant the expense of keeping up a station, with the necessary equipment to board ships, but the underlying principle is safety of commerce. Corner Brook is a small port, and the records kept there are not satisfactory. Three or four vessels plying in and out of the port and subject to pilotage are commanded by local men with long experience in navigating Bay of Islands. They pay for a pilot but do not customarily take one. However, occasionally they do take pilots. There were no records available for 1928 and previous years, but it appears by stipulation that during the season of 1929 of some 32 vessels visiting Corner Brook and Humbermouth 19 took a pilot both in and out, 11 took one in or out, and only 2 did not take one either way. There is some explanation as to why some of the ships did not take pilots, but we need not quote the evidence. We conclude, on a clear preponderance of the evidence, that pilotage was customary at Corner Brook.

■ Pilot Paul Young died before this suit was brought, so was not available to testify. However, it was shown by undisputed testimony that he was a licensed pilot, that he had acted as a pilot in Bay of Islands from 1924 to 1929, had never had an accident, and his reputation was good. He had resided in the vicinity of Bay of Islands for about 35 years, went to sea when he was a boy, and was master of fishing vessels and sealing vessels for over 26 years. We repeat, a pilot is employed because of his presumed knowledge of currents, hidden obstructions, and other local dangers of navigation. He is in charge so far as giving steering directions, and it is customary for him to dock the ship, but the master is always in command of his vessel and has the right to displace the pilot at any time. When the Framlington Court reached Corner

Brook safely under the direction of Paul Young, he had practically completed his duties. Considering that when the master took charge he, as well as the pilot, was unable to dock the ship because of the state of the weather, and the master was in charge when the ship anchored, any reflection upon the pilot's competency arising from that incident is too trivial to be considered. We conclude that Paul Young was a competent pilot and the master's reasons for not taking him were entirely without substantial foundation.

It is apparent that the facts in this case bring it squarely within the rule requiring that a competent local pilot be on board the ship to render her seaworthy at the inception of the voyage. However capable the master may have been to navigate his ship from port to port in open water, he was utterly incompetent to guide her through that particular part of the voyage from Corner Brook to sea. He did not know the force of the currents he might encounter, and this was a danger he could not see. This and other dangers a local man would have been familiar with. He showed great carelessness in driving ahead at full speed in a fog in unknown waters. By proceeding to sea at night without taking a local pilot when one was available, he demonstrated he was not a master of sound judgment and discretion. His incompetence and the consequent unseaworthiness of the ship contributed to the stranding. The Portsmouth, 9 Wall. 682, 19 L. Ed. 754. But we need not rest the decision on that ground. The ship was as much bound by the provisions of the Harter Act as if she had been a common carrier. The duty of the owner to make his ship seaworthy at the inception of the voyage is nondelegable, and any negligence on the part of the ship's master or crew is attributable to the owner. The burden was on appellee to show due diligence in rendering the vessel seaworthy, and that burden has not been sustained. Int. Nav. Co. v. Farr & Bailey Mfg. Co., 181 U. S. 218, 21 S. Ct. 591, 45 L. Ed. 830; The Southwark, 191 U. S. 1, 24 S. Ct. 1, 48 L. Ed. 65; Bethlehem Shipbuilding Corp. v. Joseph Gutradt Co. (C. C. A.) 10 F.(2d) 769. It is now settled that, when the owner relies upon an exception in a charter to escape liability for an accident resulting from errors of navigation, and is guilty of negligence in not making his vessel seaworthy, it is not necessary to show causal relation between the defect and the disaster. May et al. v. Hamburg-Amerikanische Packetfahrt Aktiengesellschaft (U. S.) 54 S. Ct. 162, 78 L. Ed.

——, decided December 4, 1933. We conclude that the Framlington Court was not properly manned and was unseaworthy at the inception of the voyage when she broke ground at Corner Brook. And the owner had not used due diligence to make her seaworthy. The owner was not relieved of liability for damage to the cargo and short delivery.

The judgment appealed from is reversed, and the case remanded for further proceedings not inconsistent with this opinion.

Reversed and remanded.